Joseph **LERMAN**, Plaintiff,

v.

**ITB MANAGEMENT CORPORA-TION**, et al., **Defendants.**

**Civ. A. No. 72-1363-T.**

United States District Court,
D. Massachusetts.

Jan. 5, 1973.

Harvey A. Silverglate, Zalkind & Silverglate, Boston, Mass., for plaintiff.

George C. Caner, Jr., Ropes & Gray, Boston, Mass., for defendants.

## OPINION

TAURO, District Judge.

Plaintiff, a shareholder in Investment Trust of Boston (the Fund) brings this action derivatively on behalf of the Fund alleging violations of the Investment Company Act of 1940, the Investment Advisors Act of 1940, the Securities Act of 1933 and the Securities Act of 1934.

Although the complaint's allegations are set forth with something less than full clarity, it is now apparent, after lengthy oral argument, that the essence of Plaintiff's grievance is a so-called management externalization plan initiated by the trustees in September, 1968.

Defendants are individuals who served as trustees of the Fund in September 1968 (Bradford, Hauers, and Henry), four of its present trustees (Henry, Woodard, Cabot and Appley), ITB Management Corp. (the external investment advisor), and I.T.O.B. (the Fund itself). No demand under Rule 23.1 has been made on either the trustees or the shareholders of the Fund.

Defendants Cabot and Woodard have moved to dismiss for non-compliance with Federal Rules 8(a), 9(b), and 23.1.

Prior to September 1968, the Fund's investment securities were managed by its five trustees who were paid an annual fee based upon the net asset value of the Fund. In September 1968, the trustees, with the approval of the shareholders, entered into an investment advisory contract with ITB Management Corporation, thereby "externalizing" management of the Fund's securities.

Under the contract ITB, in return for its management services, was to be paid an annual fee based upon the net asset value of the Fund. The fee provided for in the contract was at a rate less than that previously authorized the trustees for their *internal management of investments.* (I.T.O.B. Proxy Statement of August 12, 1968, p. 4). The term of the contract was from year to year, requiring reapproval at least annually by a majority of the unaffiliated trustees or by majority vote of the shareholders of the Fund. The contract would terminate automatically if assigned, and could be terminated by either party by not more than 60 nor less than 30 days notice. (Affidavit of Thomas J. Brown, attached Prospectus, p. 4).

Plaintiff argued at oral hearing that this externalization plan allowed those defendants who were trustees in September, 1968 *to appropriate for themselves* a valuable asset of the Fund— namely, the right to manage the Fund's investment securities, and the opportunity to derive benefits from the transfer of this right. Plaintiff further argued that, because of the overlap between the trustees of the Fund and the directors of ITB Management Corp.,[1] annual reap-

---

1. At the time the advisory contract was proposed, all but one of the directors of ITB Management were trustees of the Fund. Upon approval of the contract, two of these directors resigned as trustees, thus leaving Bradford, Hauers, and Henry playing dual roles as trustees of the Fund and directors of the investment adviser. I.T.O.B. Proxy Statement of August 12, 1968, p. 4–5. Presently, only one trustee of the Fund, Henry, is affiliated with ITB Management Corp. Affidavit of Thomas J. Brown.

proval of the investment advisory contract was assured.

 Defendants Cabot and Woodard move to dismiss the complaint on the grounds that it does not comply with A) Rule 8(a) (requiring a "short and plain statement of the claim"); B) Rule 9(b) (requiring that in all averments of fraud, "the circumstances constituting fraud . . . shall be stated with particularity"); and C) Rule 23.1 (requiring that in a shareholder derivative action, the complaint allege the reasons for the failure, if any, to make a demand on the directors).

Defendants' 8(a) and 9(b) objections are well taken. The complaint is lengthy, repetitive and fails to give the defendants, either individually or collectively,[2] fair notice of the Plaintiff's claim and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On the contrary, Plaintiff merely alleges in conclusory fashion that ITB "exploits investment policies of the Fund in violation of the fiduciary duties imposed upon it" (Par. 11); "that defendants used their control over the Fund in such manner as to subordinate the possibility of the Fund benefiting [sic] from its own brokerage business by utilizing methods of reducing or recapturing commissions, all of which were available to it" (Par. 12); that defendants have "deprive[d] the Fund of its right to have portfolio transactions executed by brokers and dealers selected solely for efficiency in executing at lowest cost" (Par. 18); that defendants are guilty of "gross negligence, waste and misappropriation . . . " (Par. 31); and that defendants "converted, looted and wasted fund assets." (Par. 41).

A matter of further confusion is that while the complaint charges that "defendants" caused "the Fund [to pay] excessive commissions and premiums" (Par. 14) and "excessive fee[s]" (Par. 30) to defendants, Plaintiff's counsel stated at oral argument that Plaintiff is *not* complaining about excessive fees, but rather about the value of the ITB Management Corporation stock obtained by defendants through the externalization plan.[3] I am unable to find language within the complaint that could reasonably be expected to notify the Defendants that such was the Plaintiff's claim.

Plaintiff's allegations of looting, gross abuse of trust and the like are in effect charges of fraud. At oral argument Plaintiff's counsel acknowledged that the gravamen of his complaint was one of fraud as opposed to negligence. Nonetheless, the complaint fails to specify with the particularity required by

---

2. The complaint in no way attempts to delineate among the defendants their participation or responsibilities in the activities which are the subject of this suit.

3. It should be noted in this regard: "The Articles of Organization of the Adviser [ITB Management] contain restrictions on the transfer of the corporation's Class A and Class B Common Stock. The following is a brief description of such restrictions. If a holder of Class A Common Stock ceases to be an officer, director or employee of the corporation or wishes to transfer his shares or dies, he or his estate is given the option to require the corporation to purchase all or part of his Class A shares at Book Value with the balance not so to be purchased by the corporation to be converted into non-voting Class B Common Stock. If a holder of Class B Common Stock wishes to sell his shares he may only sell them at Book Value to the corporation or to another person. As stated above, these restrictions may not be amended, so long as the advisory contract with the Adviser is in effect, without the approval of the holders of a majority of the outstanding shares of the Trust. The term 'Book Value' of shares is defined to mean Book Value as shown by the capital and surplus accounts appearing on the most recent quarterly balance sheet of the corporation prepared in accordance with accounting principles consistently followed in the past, provided that good will or like intangible terms shall not be included as an asset on such balance sheet." I.T.O.B. Proxy Statement of August 12, 1968, p. 5–6.

Rule 9(b) the fraud complained of. More important, it fails to particularize as to each, or for that matter any, of the defendants the activities for which the Plaintiff seeks to hold them accountable.

Were these the only deficiencies of Plaintiff's complaint I would allow Defendants' Motion to Dismiss, subject to Plaintiff's filing a properly amended complaint within thirty days. A more fundamental deficiency of the complaint, however, its failure to comply with provisions of Rule 23.1, requires me to allow Defendants' Motion to Dismiss on this ground.

The complaint fails to allege with particularity the reasons for Plaintiff's admitted failure to make any demand upon the directors (trustees) of the Fund on whose behalf he purports to sue derivatively.

In pertinent part Rule 23.1, Federal Rules of Civil Procedure states:

The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.

The complaint's only reference to the demand requirement is as follows (Par. 24):

Demand upon the Fund to bring this action would be futile because those in control of the Fund are alleged wrongdoers. Statutes place such decisions in the directors and control of such an action would be subject to control of the wrongdoers, preventing diligent prosecution.

Such a bare allegation has been held on innumerable occasions to be insufficient to satisfy Rule 23.1.[4] It is particularly inadequate on the facts of the instant case.

When it is clear that a demand upon the directors would be rejected by them, courts have dispensed with the requirement that demand be made. Moore, 3B Federal Practice par. 23.1.19, at 255 (2d ed. 1969). In such cases it had been alleged clearly that the directors were "antagonistic, adversely interested, or involved in the transaction attacked". Cathedral Estates v. Taft Realty Corp., 228 F.2d 85, 88 (2d Cir. 1955). See also Maxwell v. Enterprise Wall Paper Mfg., Co., 47 F.Supp. 999, 1001 (E.D.Pa.1942), rev'd on other grounds 3 Cir., 131 F.2d 400, where it was alleged that the individual defendant held the majority of the stock, that such stock ownership gave him complete control of the election of directors and the management of the business, that he did not permit corporate meetings to be held, and that the last such meeting was five years before; and Pioche Mines Consol., Inc. v. Dolman, 333 F.2d 257 (9th Cir. 1964), cert. denied 380 U.S. 956, 85 S.Ct. 1081, 13 L.Ed.2d 972.

The consistent standard recognized and applied by the courts in these cases was one of futility. Plaintiff has offered nothing by way of testimony or affidavit which would warrant the conclusion that a demand on the Fund's existing trustees would be futile.

The complaint does not charge the trustees with antagonism, adverse interest or even involvement in the 1968 externalization. On the contrary, an uncontroverted affidavit filed by Defendants here states that of the five present

---

4. See Robison v. Caster, 356 F.2d 924, 926–927 (7th Cir. 1966); Quirke v. St. Louis-San Francisco Ry. Co., 277 F.2d 705, 707 (8th Cir. 1960); Lucking v. Delano, 117 F.2d 159, 160 (6th Cir. 1941); Baffino v. Bradford, 57 F.R.D. 79 (D. Minn.1972); In re Kauffman Mutual Fund Actions, 56 F.R.D. 128 (D.Mass. 1972); Norte & Co. v. Krock, 37 F.R.D. 543, 544 (D.Mass.1965); Levitan v. Stout, 97 F.Supp. 105, 114–115 (W.D. Ky.1951); Bartlett v. New York, N.H. and H.R.R., 221 Mass. 530, 536–539, 109 N.E. 452 (1915).

trustees of the Fund only one is affiliated with ITB Management Corporation.[5] Further, of the five present trustees, only one was a trustee in September, 1968, when the original contract complained of was approved.[6]

From these facts and the complaint it cannot be reasonably presumed that a majority of the trustees were involved in the alleged wrongdoing (see Norte & Co. v. Krock, 37 F.R.D. 543, 544 (D. Mass.1965)), or were so committed to the course of action initiated by their predecessors that it would be futile to call an alternative course to their attention which would be of more potential benefit to the Fund and its shareholders. As was made clear at oral argument, a demand pursuant to 23.1 would not call upon the trustees to in effect proceed against themselves for recapture of profits or for damages on behalf of the Fund. What Plaintiff seeks is a cancellation of the existing external management contract and a return to the pre-September 1968 program of internal management. As has been pointed out, this course of action is open to the trustees on an annual basis, or at any time upon the giving of sixty days notice to the investment adviser. Compare Meltzer v. Atlantic Research Corp., 330 F.2d 946, 948 (4th Cir. 1964), cert. denied 379 U.S. 841, 85 S.Ct. 78, 13 L.Ed. 2d 47, where none of the wrongful acts of the defendant—directors were denied by them, and the court found that "demand of the directors that the corporation recapture these loans and appropriations, as well as recover damages suffered by the corporation, would have been utterly unavailing;" and Liboff v. Wolfson, 437 F.2d 121 (5th Cir. 1971), where the defendants admitted control over a majority of directors.

■■ The purpose of requiring that the complaining shareholder demand action from the Board of Directors before bringing suit is related to the concept that a shareholder derivative action is a device to be used only when it is clear that the corporation will not act to redress the alleged injury to itself. Wright and Miller, 7A Fed.Prac. and Proc. Sec. 1831, at 374 (1972). The corporation should have an opportunity to "vindicate its own rights . . . ." Cohen v. Beneficial Industrial Loan Corporation, 337 U.S. 541, 548, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). "[B]efore the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes." Hawes v. Oakland, 104 U.S. 450, 460–461, 26 L.Ed. 827 (1881).

The demand requirement also performs important practical functions.[7] Underlying Rule 23.1 is the notion that

5. Affidavit of Thomas J. Brown.

6. I.T.O.B. Proxy Statement of August 12, 1968, p. 4–5.

7. "The demands serve to notify the directors of the alleged cause of action and to inform the shareholders of the directors' refusal to prosecute it. Even if no action is taken in accordance with the demands, the cumulative effect of such notifications may ultimately have a healthy influence on the corporation. If action is taken by the shareholders, the effect may be to rid the corporation immediately of a corrupt or incompetent management. Acceptance of a demand by directors or shareholders may place the entire strength of the corporation—including its access to information, its personnel, its funds, and its counsel—behind the suit. This removal of the suit from the would-be plaintiff's exclusive control has the additional effect of eliminating the danger of a secret settlement between him and the alleged wrongdoers. Moreover, the mere possibility of such removal discourages one of the major abuses in the use of the derivative suit, namely, its employment as a device to enable plaintiff's counsel to earn substantial fees." (footnote omitted). Note, "Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit," 73 Harv.L.Rev. 746, 748–49 (1960).

requiring exhaustion of intracorporate remedies will foster amicable resolution of differences. Weiss v. Sunasco, Inc., 316 F.Supp. 1197, 1206 (E.D.Pa.1970).

A demand upon the trustees would serve additionally to effectuate the policy underlying the requirement that at least 40% of the board of an investment company [8] be composed of persons who are not "interested persons of such registered company." Investment Company Act of 1940, 15 U.S.C. Section 80a–10(a)(1971).[9]

As stated in Moses v. Burgin, 445 F. 2d 369, 376 (1st Cir. 1971), cert. denied 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547, it was the intent of Congress that these unaffiliated directors would be "independent, watchdog directors."[10] An implicit corollary to their responsibility to serve as "an independent check on management" and "a means for the representation of shareholder interest," 1970 U.S.Code Cong. and Adm. News, at p. 4927, is the right of the uninterested trustees to be made aware of shareholder demands and to have an opportunity to take a position with respect to them.

Plaintiff's conclusory and unsupported allegation that "those in control of the Fund are alleged wrongdoers" (Complaint, Par. 24) is insufficient to overcome the inferences warranted from the affidavit of Thomas J. Brown and the Proxy Statement which distinguish the composition of the Fund's existing Board of Trustees from that which initiated the externalization plan in 1968.

Further, such allegation is insufficient to overcome the presumption established in the Investment Company Act that a "natural person" is not a "controlled person." 15 U.S.C. Section 80a–2(a)(9). See also In re Kauffman Mutual Fund Action, 56 F.R.D. 128 (D. Mass.1972). "[W]hen [it is claimed that] a majority of the board is under the control of the defendants . . . that control must be alleged and proved with enough specificity to warrant the inference that those 'controlled' could not reasonably be expected to vote for acceptance of the demand." (footnotes omitted). Note, "Demand on Directors and Shareholders as Prerequisite to a Derivative Suit," 73 Harv.L.Rev. 746, 753–54 (1960).

In *Kauffman, supra*, plaintiff charged the affiliated minority of the directors with specific misconduct, and alleged that the unaffiliated majority were "controlled." The district court dismissed the complaint for failure to make demand on the directors, finding plaintiff's allegations of futility to be insufficient.

The insufficiency of Plaintiff's claim of futility is even more obvious in the instant case. As noted above, only one of the Fund's present trustees is affiliated or connected with the investment adviser. (Affidavit of Thomas J. Brown). Unlike *Kauffman*, there is not even an allegation that the unaffiliated trustees were controlled by the single affiliated trustee. Furthermore, only one of the Fund's present trustees was a

8. The Fund is registered under the Investment Company Act of 1940 as an open-end diversified investment company. Complaint, Par. 5. 80% of the Fund's Board are disinterested persons. Affidavit of Thomas J. Brown.

9. An "interested person" includes: affiliated persons of an investment company, its investment adviser and principal underwriter; members of the immediate family of such affiliated persons; and persons who have beneficial or legal interests as fiduciaries in securities issued by the in-

vestment adviser, principal underwriter and their controlling persons. 15 U.S.C. Section 80a–2(a)(19).

10. Since the *Moses* case, Section 80a–10(a) has been amended to substitute "interested persons" for "affiliated persons." Pub.L. 91–547 (1970). The purpose of the change was to broaden the category of persons excluded because of self-interest, and thus remedy the prior definition's deficiencies. 1970 U.S.Code Cong. and Adm. News, at p. 4928.

trustee at the time the contract complained of was originally proposed and approved.

The plaintiff has failed to justify its failure to afford the majority of new and unaffiliated trustees of an opportunity to act on his demand. See Corey v. Independent Ice Co., 207 F. 459, 464 (D.Mass.1913), where the court indicated that a complaint alleging a demand on the directors nineteen months before the institution of suit should also allege that the same directors were presently in office, in order to comply with the demand requirement; and Moore, 3B Federal Practice par. 23.1.19, at 252, indicating the necessity of alleging that a new board of directors has not been installed since demand was made.

The requirements of Rule 23.1 are clear and unambiguous. Their usefulness has been acknowledged and analyzed on numerous occasions. To be excused from these requirements a party must demonstrate with at least some particularity that a demand upon those in authority would be a futile gesture. The rule's standard of "particularity" is not met by assertions of generality. To permit a lesser standard would be to encourage boilerplate efforts at avoidance in all derivative suits.

Plaintiff's bare allegation that demand on the trustees, four or five of whom are unaffiliated and were not trustees in September, 1968, is inadequate as a demonstration of futility.

Plaintiff's counsel acknowledged at oral argument that had he handled this case from its inception, he would have made a demand on the trustees. Such a statement is at least inferentially inconsistent with a claim of futility.

The motion to dismiss of defendants Cabot and Woodard for failure of the complaint to meet the requirements of 23.1 F.R.C.P. is allowed.