Walter J. UNTERMEYER, Jr.

v.

**FIDELITY DAILY INCOME TRUST**
et al.

Civ. A. No. 76–1802–T.

United States District Court,
D. Massachusetts.

May 4, 1978.

Roche, Carens & DeGiacomo, Robert J. Sherer, Boston, Mass., Silverman & Harnes, Sidney B. Silverman, New York City, for plaintiff.

George K. McKenzie and William R. Spaulding, Bingham, Dana & Gould, Sumner H. Babcock, E. Susan Garsh, Boston, Mass., for defendants.

Gaston Snow & Ely Bartlett, Peter M. Saparoff, Boston, Mass., Edward C. Johnson, III, Calen Loring, Jr., Fidelity Management & Research Co., Goodwin, Procter & Hoar, James S. Dittmar, Carol Goodman, Boston, Mass., for Fidelity Daily Income Trust.

## OPINION

TAURO, District Judge.

Plaintiff is a shareholder of Fidelity Daily Income Trust (FDIT), a management investment trust. He brings this derivative action on behalf of FDIT under the Investment Company Act of 1940[1] against FDIT, its individual trustees, and its investment adviser and shareholder service agent.

By order of May 17, 1977 (Appendix), this court dismissed plaintiff's "Amended and Supplemental Complaint"[2] for failure to comply with Fed.R.Civ.P. 23.1.[3]

At issue now is plaintiff's motion to file a "Second Amended and Supplemental Complaint."[4] For the reasons set forth below,

---

1. 15 U.S.C. §§ 80a–1 et seq.

2. The original complaint was filed on February 25, 1975, in the Southern District of New York. Plaintiff amended the complaint while the action was pending there. On April 22, 1976, the action was transferred to this district by Judge Gagliardi pursuant to 28 U.S.C. § 1404(a). The complaint originally filed in this court was entitled plaintiff's "Amended and Supplemental Complaint."

3. Rule 23.1 states, in relevant part:
    The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members,

and the reasons for his failure to obtain the action or for not making the effort.

4. This motion to file a "Second Amended and Supplemental Complaint" was pending on April 25, 1977 at the time this court heard argument, as scheduled, on defendants' motion to dismiss. The motion to amend was not scheduled for argument on that day and this court chose to restrict argument to the motion to dismiss. By order dated May 17, 1977 defendants' motion to dismiss was allowed. (Appendix). Plaintiff filed a notice of appeal on June 17, 1977. After hearing, the First Circuit, on November 2, 1977, remanded to this court for a ruling on plaintiff's motion to amend. It ordered:
    Within 30 days . . . the district court may revoke the judgment for the defendants,

letting stand its order dismissing the first amended complaint, but expressly leaving open the motion to amend further . . . . Alternatively, the district court shall enter an order simply reasserting the present judgment for the defendants. In this event . . we will proceed to consider plaintiff's present appeal, reading the judgment as including a denial of the motion to amend.

*Untermeyer v. Fidelity Daily Income Trust,* 564 F.2d 615 (1st Cir. 1977).

On November 30, 1977, consistent with the order of the Court of Appeals, this court revoked the judgment of May 18, 1977 for defendants and reaffirmed the order dismissing the "Amended and Supplemental Complaint."

Further briefing was ordered from counsel as to plaintiff's motion to amend. Final briefs were submitted on February 6, 1978. The substantive issues of plaintiff's motion to amend have been under advisement since that date, and are the subject of this opinion.

In the First Circuit November 2, 1977 opinion, remanding to this court for a determination as to plaintiff's motion to amend, Judge Aldrich indicated some concern that plaintiff was required to file his June 17, 1977 Notice of Appeal without having had a decision from this court as to the motion to amend. Judge Aldrich's stated concern requires at least brief exposition of the underlying facts which resulted in that situation.

After this court issued its judgment of May 18, 1977, it scheduled a hearing for June 27, 1977 on plaintiff's motion to amend. That scheduling order, dated June 2, 1977, led to a barrage of correspondence from counsel on both sides. Plaintiff's counsel requested by letter, rather than by motion, that the hearing be held prior to June 17, the last date by which he could appeal this court's action of May 18. In a second letter, however, he informed the court that any appeal he took of the May 18 action would, in any event, also place his motion to amend before the Court of Appeals for determination. Plaintiff's counsel wrote:

Once the notice of appeal is filed, this court will be divested of jurisdiction to consider the motion to amend. However, even though this court has not acted on that motion, the Court of Appeals can review not only whether the original complaint was properly dismissed, but whether leave to amend should be granted. [*Citing Asher v. Harrington,* 461 F.2d 890 (7th Cir. 1972)]. Although plaintiff intends to raise both points on appeal, he is interested in prosecuting the second amended and supplemental complaint and would not appeal the dismissal of the complaint if leave to amend were granted by this court.

The clear import of plaintiff's letter, at least in the eyes of this court, was that plaintiff felt it had a right as a matter of law to raise on appeal both the allowance of the motion to dismiss and the failure of the court to allow a second motion to amend. It demonstrated an ambivalent attitude on the part of plaintiff's counsel as to whether or not this court ruled on the motion to amend prior to the June 17, 1977 appeal date.

Contemporaneously, this court received four letters from defendants' counsel requesting scheduling changes. One defendant's counsel informed this court that, due to business travel plans, he could not attend any hearing before June 27 (by which time plaintiff's appeal date would long since have passed).

In light of plaintiff's representations and ambivalent attitude, and defendants' scheduling conflicts, and in the absence of proper motions requesting precisely some form of relief or action by this court, a hearing date was not scheduled prior to June 17.

Due to further scheduling conflicts, a hearing on the motion to amend was not conducted until September 1. At that time, all parties informed this court it had no jurisdiction to proceed on the motion to amend, because plaintiff had appealed the May 18 judgment to the Court of Appeals on June 17, 1977. This court agreed and so no action was taken on the motion.

It is regrettable that this case, already delayed through transfer from the Southern District of New York to this jurisdiction, was further delayed by an inconclusive appeal. Had plaintiff's counsel submitted a motion requesting a hearing prior to June 17, rather than ambiguous correspondence, a hearing would probably have been conducted prior to June 17. Even if this court's calendar, and defendant counsels' unavailability, had precluded holding a hearing prior to June 17, plaintiff's counsel would not have been without remedy. Under Rule 4(a) of the Federal Rules of Appellate Procedure, he could have moved for an extension of time for filing the notice of appeal. That rule encompasses those occasions when the need for extension is attributable to the District Court, rather than to any neglect by the parties. *See Fairway Center Corporation v. U.I.P. Corporation,* 491 F.2d 1092 (8th Cir. 1974).

In his opinion, Judge Aldrich observed that opacity is not one of a district court's prerogatives. This court wholeheartedly agrees. As the record of correspondence detailed above indicates, however, there was no opacity here. The plaintiff was fully apprised of the procedural posture of the case and at no time demonstrated confusion.

As plaintiff's above-quoted letter made clear to this court, he felt he had the right to appeal both pending matters to the Court of Appeals. He assumed, incorrectly, that this circuit would consider the doctrine of *Asher v. Harrington,* 461 F.2d 890 (7th Cir. 1972), to be apposite to this case. There, the Seventh Circuit had indicated:

the amendment would be futile, and the motion is therefore denied.[5]

### I.

Defendant FDIT is an investment fund.[6] It sells shares to the public, and invests the proceeds in various money market instruments. Defendant Fidelity Management and Research Company (FMR) is FDIT's investment adviser, and determines the investments made by FDIT. Defendant Fidelity Management and Research Company Services Co. (Services), a subsidiary of FMR, performs certain of FDIT's accounting and shareholder servicing functions.

The four individual defendants are trustees of FDIT.

The Second Amended and Supplemental Complaint asserts two counts against all defendants. Count one alleges that the defendants undervalued the portfolio assets, issuing shares of FDIT based either upon the "cost" or the "bid" value, rather than the higher "market value", of the portfolio

securities. Defendants' valuation practices are said to violate Section 22(c) of the Investment Company Act[7] and SEC Rule 22c-1[8] promulgated thereunder, which requires valuation at "net asset value."[9]

According to plaintiff, the challenged sales practice deprived FDIT of the proceeds it would have obtained through sale of shares at their full value, and diluted plaintiff's equity interest. Plaintiff asserts that, as a result of this sales practice, FDIT's shares sold actively; and that defendants FMR and Services, which were compensated based on a percentage of FDIT's average daily assets and a flat fee-per-shareholder, were the direct and sole beneficiaries of the growth in the total of assets and the increase in the number of shareholders.

The second count alleges that "unnecessary, excessive and unfair" fees have been paid defendants FMR and Services since

Note 4—Continued
[T]he practical result of plaintiffs' actions in appealing the complaint was to cut off the opportunity to amend at the district court level, and technically, under Rule 41(b), Fed. R.Civ.P., a dismissal of the complaint operates as a dismissal with prejudice, unless the court specifies otherwise. Our review can include not only whether the original complaint was properly dismissed, which we have already considered, but whether leave to amend should have been granted.
461 F.2d at 895.

5. The court should deny a motion to amend if the complaint as amended would be subject to immediate dismissal. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

6. It is registered with the Securities and Exchange Commission as a no-load, diversified, open-end management investment trust. Second Amended and Supplemental Complaint ¶ 3.

7. 15 U.S.C. § 80a–22(c). This section states, in relevant part:
The Commission may make rules and regulations applicable to registered investment companies . . . to the same extent, covering the same subject matter, and for the accomplishment of the same ends as are prescribed in subsection (a) of this section in respect of the rules which may be made by a registered securities association governing its members. . . . .

8. 17 C.F.R. 270.22c–1. The rule states:
Pricing of redeemable securities for distribution, redemption and repurchase.
(a) No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.
(b) For the purposes of this section, the current net asset value of any such security shall be that computed on each day during which the New York Stock Exchange is open for trading, not less frequently than once daily as of the time of the close of trading on such Exchange.

9. Count one is also brought under Section 36 of the Investment Company Act. See n. 10 *infra,* for the relevant text of that statute. There is considerable question whether undervaluation of assets can form the basis of a claim under Section 36. For two reasons, however, it is not necessary to reach that question. First, to the extent that count one is brought under Section 36, it merely duplicates count two. Second, count one must be dismissed for failure to comply with Fed.R.Civ.P. 23.1 even if brought under Section 36. *See* Section III *infra.*

June, 1974, in violation of Sections 15(c) and 36(b) of the Investment Company Act.[10] According to plaintiff, the services provided by these defendants to FDIT have remained constant since the creation of the fund, while the fees, which increase directly in proportion to the number of shareholders and the size of the assets, have grown enormously. The individual trustees are said to have violated their fiduciary obligations to FDIT by failing to request relevant data from FMR and Services prior to approving the contracts, and by allowing those contracts to remain in effect.[11]

## II.

Plaintiff has made no demand on the trustees of FDIT to bring either of the two counts directly on behalf of FDIT.

■ When it is clear that a demand on the directors would be rejected, demand

under Rule 23.1 is considered futile, and is excused. *Lerman v. ITB Management Corporation*, 58 F.R.D. 153, 156 (D.Mass.1973). Plaintiff has offered four reasons why demand was futile and therefore unnecessary as a condition precedent to either of his two counts:

1) Two of the trustees are among the principal owners of FMR, which benefited from the alleged wrongful acts;

2) The trustees are named as defendants in the complaint and, therefore, are potentially liable;

3) The trustees have had knowledge of, acquiesced in and participated in the alleged misdeeds; and

4) The trustees would be hostile to the action, and would block its effective prosecution.[12]

---

**10.** Section 15(c) of the Act, 15 U.S.C. § 80a–15(c) states, in relevant part:

(c) [I]t shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement . . . whereby a person undertakes regularly to serve or act as investment adviser of . . . such company, unless the terms of such contract or agreement . . . have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party . . . .. It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.

Section 36(b) of the Act, 15 U.S.C. § 80a–35(b), states, in relevant part:

(b) [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation

or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. . . .

**11.** Plaintiff seeks equitable relief leading to the valuation of FDIT's securities "at market"; an accounting to FDIT by defendants other than FDIT for all profits resulting from the illegal valuation; an accounting by FMR and Services to FDIT for all compensation received from FDIT in excess of a fair amount; and an injunction prohibiting Services from charging any fees to FDIT and its shareholders.

**12.** The four reasons offered by plaintiff are summarized and re-ordered in the text. The precise language of the complaint is:

Demand upon the Trustees of FDIT to bring this action is unnecessary and would be futile because:

(a) the Trustees are defendants herein and are jointly and severally liable for the damages caused to FDIT and accountable for the profits obtained by defendants as a result of the breach of their fiduciary duties;

(b) the Trustees have had knowledge of, acquiesced in and participated in the wrongs set forth herein. In view of the fact that they have approved of and benefited from the wrongdoings, it is unreasonable to expect them to reverse their former positions and assert this action on behalf of FDIT;

(c) two of the Trustees, defendants E. C. Johnson, 3rd and Caleb Loring, Jr., are among the principal owners of defendant Management Company which benefited from the wrongful

Twice in recent years, the First Circuit has set forth standards by which arguments of futility must be evaluated. In *In Re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973), a shareholder in four mutual funds brought a derivative action for antitrust violations [13] against the directors and advisers of the funds without first demanding that the directors themselves prosecute the action. The Court of Appeals affirmed dismissal of the suit for failure to make a demand.

■ As the court explained, plaintiff's initial burden under Rule 23.1 is "to demonstrate why the directors are incapable of doing their duty, or as the [Supreme] Court has put it, to show that 'the antagonism between the directory and the corporate interest . . . be unmistakable.'" 479 F.2d at 263 (citation omitted). Plaintiff must meet this burden through particularized allegations in the complaint. "[T]he stockholder may not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case. Indeed, if the requirement could be met otherwise, it would be meaningless." *Id.*

Recently, the First Circuit reemphasized these principles. In *Heit v. Baird*, 567 F.2d 1157 (1977), affirming an order of this court dismissing a shareholder's suit for failure to make demand,[14] the Court of Appeals noted that "in this circuit the Rule [23.1] has been vigorously enforced." 567 F.2d at 1160. To be excused from the demand requirement "the plaintiff must show not only that some directors were hostile to his suit because of

their own self interest, but that a majority of the board at the time of suit were so implicated in the complained of acts as to make a demand for redress futile." *Id.* at 1160.

Considering plaintiff's allegations of futility *seriatim*, it is clear that they fail to meet the standards set by this Circuit.

■ 1) *Two of the trustees are among the principal owners of FMR, which benefited from the alleged wrongful acts.*

According to plaintiff, the undervaluation of assets led to enormous sales of cheap FDIT shares.[15] FMR and Services (and the two trustees, as principal owners) are said to have benefited through fee structures based on a percentage of FDIT's average daily assets, and a flat fee-per-shareholder, both of which increased as the level of sales rose.

The causal chain from valuation to excessive fees is a tenuous one. But even assuming *arguendo* that the two trustees who own FMR can be said to be "interested," this would leave the Board evenly divided between interested and disinterested trustees at the time the original complaint was filed.[16]

■ Had plaintiff made a demand on the trustees, consistent with Rule 23.1, the trustees might have deadlocked two to two. It would be unfounded speculation, however, for this court to so assume. Whether a mere allegation that a board is evenly divided excuses a plaintiff from pursuing the

acts described herein. Thus, it would be unreasonable to expect the Trustees to authorize suit against the Management Company;

(d) the institution of this action by the Trustees would place it in hostile hands and would prevent its effective prosecution. ·

**13.** Plaintiff alleged that defendants had conspired to adopt similar schedules of grossly excessive management fees, and had agreed to refrain from competing for the business of mutual funds and the business of investment advisers, in violation of federal antitrust laws.

**14.** In *Heit*, plaintiff shareholder brought a derivative action on behalf of the corporation against its Board of Directors. The complaint alleged that the board, anticipating a contest for control by a minority shareholder, issued a

large block of new stock that was sold on favorable terms to three of the directors of the corporation. According to plaintiff, the transaction was effected to thwart the threatened control contest, in violation of the Securities Exchange Act and Rule 10b–5.

**15.** FDIT is said to have commenced operations in June, 1974, with net assets of $100,000, and to have finished the first full year of operations with net assets of $697,065,513. Second Amended and Supplemental Complaint ¶ 14.

**16.** The four trustees named as defendants were the four trustees composing the board at the time of suit.

demand procedure in Rule 23.1 appears to be a question of first impression. This court holds that such an allegation does not of itself excuse demand. It falls short of an assertion of unmistakable antagonism between the trustees and the corporate interests. *In Re Kauffman, supra* at 263.

A function of the demand requirement is to permit the company "an opportunity to put its own house in order before resort to the courts." *Heit v. Baird, supra* at 1163. An evenly divided board presents greater opportunities for conciliation and compromise than exist when an interested majority controls. Confronting the threat of deadlock, one or more of the interested directors may abstain,[17] or even vote to take action to remedy the alleged wrongdoing.[18] If a tie vote does occur, it may be resolved through expansion of the board; or it may even lead, under certain circumstances, to initiation of the litigation by management.[19] This court is loathe to presume that the defendant Board of Trustees would not carefully and objectively consider a demand by plaintiff merely because its composition was perhaps equally divided between interested and disinterested trustees. As the cases of this Circuit have repeatedly emphasized, the burden is on the plaintiff to particularize in the complaint the reasons why demand was futile. There may be circumstances which, if properly pled, would excuse demand on an evenly divided board. A mere allegation that forces are balanced between interested and disinterested trustees, however, does not suffice.

■ 2) *The trustees are named as defendants in the complaint, and are therefore potentially liable.*

If this allegation were permitted to excuse demand, it would in effect operate to nullify Rule 23.1. Plaintiffs could always avoid the rule by naming the trustees as defendants. The excuse has been rejected

---

**17.** Indeed, Massachusetts case law suggests that directors are bound to drop out of a vote in which personal and corporate interests are at odds. In *American Discount Corporation v. Kaitz,* 348 Mass. 706, 206 N.E.2d 156 (1965), defendant had entered into a contract with plaintiff corporation to provide auditing services. Defendant had failed to report on the dissipation of assets by a director and treasurer of plaintiff, William Leventhal. Plaintiff's board of directors voted three to two to hire counsel to sue defendant, with Leventhal voting against. Defendant argued that the vote of the corporation's board of directors had failed to authorize the action, as one of the corporation's by-laws required a 70% vote of the board to perform any act. The Supreme Judicial Court disqualified Leventhal's vote, however, thereby rendering the vote three to one (or 75%). It commented:

> Simply analyzed, the situation is revealed to be one of a clear conflict of interest. By his conduct Leventhal had brought himself into an antagonistic position to that of the corporation. It was in Discount's interest that an action be brought to repair the damage to its assets charged against the defendants. It was in Leventhal's interest that his conduct not be disclosed, and that its consequences be kept concealed. . . . In the very interest of fairness it was manifestly unjust for him to take a stand against redressing the wrongs for which he was mainly responsible. . . . *On the facts William J. Leventhal possessed a personal interest adverse to Discount and was disqualified*

> *from voting on hiring counsel to institute suit.*
> 348 Mass. at 711, 206 N.E.2d 156, 160 (emphasis added).

Thus, the two interested directors of FDIT, a Massachusetts corporation, might have felt bound, by operation of law, to withdraw from a vote after demand by plaintiff.

**18.** The corporate action will not always take the form of litigation. As this court said in *Lerman v. ITB Management Corporation,* 58 F.R.D. 153, 157–8 (D.Mass.1973), "Underlying Rule 23.1 is the notion that requiring exhaustion of intracorporate remedies will foster amicable resolution of differences." Congress has provided in the Investment Company Act for termination of a contract with an investment adviser on 60 days' notice, 15 U.S.C. § 80a–15(a)(3), thereby permitting investment funds to re-orient their relationships with their adviser (or choose a new adviser) at will. A board's agreement to transform its relationship with its adviser for the future is a possible basis for the amicable resolution of differences.

Another possible basis is the submission of the controversy to arbitration, an action within the directors' power. Fletcher Cyc. Corp. (Perm. Ed.) Vol. IX at § 4723.

**19.** *See Lydia E. Pinkham Medicine Co. v. Gove,* 298 Mass. 53, 9 N.E.2d 573 (1937); *but see Kelly v. Citizens Finance Co.,* 306 Mass. 531, 28 N.E.2d 1005 (1940). A general discussion is found in Fletcher Cyc. Corp. (Perm. Ed.), § 618.1.

in this Circuit. *Heit v. Baird, supra* at 1162. *See also Brooks v. American Export Industries,* 68 F.R.D. 506 (S.D.N.Y.1975); *Phillips v. Bradford,* 62 F.R.D. 681 (S.D.N.Y.1974).

3) *The trustees have had knowledge of, acquiesced in, and participated in the alleged misdeeds.*

All four trustees approved the disputed valuation. Plaintiff concludes, therefore, that all are "interested," and that demand would be futile. An allegation of mere acquiescence in a disputed corporate action, however, is insufficient to color a trustee with interest. "Where mere approval of the corporate action, absent self-interest or other indication of bias, is the sole basis for establishing the directors' 'wrongdoing' and hence for excusing demand on them, plaintiff's suit should ordinarily be dismissed." *In Re Kauffman, supra* at 265.

According to *Kauffman,* it is necessary to examine the nature of the disputed transaction.

Logic suggests a sharp distinction between a transaction completely undirected to a corporate purpose and one which, while perhaps vulnerable to criticism, is of a character that could be thought to serve the interests of the company. If the transaction attacked was one solely for the benefit of minority, interested directors—taking out a sham loan, trading in worthless real estate—the approval of the other, nominally disinterested, directors is prima facie inexplicable. If a director goes along with a colleague in an act on its face advantageous only to that colleague and not to the corporation, this in itself is a circumstance, or particularity, supporting the claim that he is under that colleague's control. It may be assumed that he would remain so when the directorate votes on plaintiff's demand.

479 F.2d at 265.

Here, the acquiescence of the nominally disinterested trustees is not "prima facie inexplicable." The valuation of assets is an essential and complex [20] corporate act of an investor fund such as FDIT. The valuation may be subject to criticism. It might be shown, upon proof, to be in violation of the Investment Company Act.[21] But the complaint offers only the conclusory allegation that the assets were not priced at net value. It fails to set forth facts necessary to demonstrate that the disputed corporate act was so plainly advantageous to the interested directors, and antagonistic to the interests of the corporation, as to render the act "prima facie inexplicable" on other grounds.

4) *The trustees would be hostile to the action, and block its effective prosecution.*

The fourth reason offered adds nothing to the other three. If, upon demand, the trustees agreed to initiate litigation, it would be totally unwarranted for this court

---

**20.** On May 31, 1977, the SEC issued a Rule Interpretation to govern the valuation of money market assets by registered investment companies. In setting forth guidelines for valuation, it commented:

The Commission recognizes that, in the absence of the interpretation it has determined today to issue, *there has been considerable confusion and uncertainty as to the appropriate methods to be utilized by "money market" funds in valuing their portfolio securities.* This interpretation should help remove the uncertainty and further the objectives of enabling investors in such funds to: (1) purchase and redeem their shares at prices appropriately reflecting the current value of fund portfolio securities; (2) be properly credited for any unrealized appreciation or depreciation in such portfolio securities; and (3) be provided with meaningful and compa-

rable information with which to appraise investment returns and the current earning ability of "money market" funds.

SEC Investment Company Act Release No. 9786, May 31, 1977, CCH Fed.Sec.L.Rep. ¶ 72,-241 ("1977 Release") (emphasis added).

When the SEC has acknowledged "confusion and uncertainty" in the industry on lawful methods of valuation, the allegation that FDIT did not price its assets at "net asset value" is merely conclusory.

**21.** The allegation that the disputed corporate act is illegal adds nothing. As the court stated in *Kauffman,*

A minority stockholder, unless his claim is worthless on its face, necessarily alleges some illegal transaction or conduct harmful to the corporation.

479 F.2d at 265.

to assume that the interested trustees would somehow control the action.

This court concludes that plaintiff failed to comply with the requirements of Rule 23.1 with respect to the allegations contained in count one.

### III.

Count two is a derivative action alleging the payment of excessive advisory, accounting and service fees to FMR and to Services in violation of Sections 36 and 15(c) of the Investment Company Act. The four allegations purporting to excuse demand for the second count are identical to those set forth for the first count. Again, plaintiff has failed to meet the requirements of Rule 23.1.[22]

Two of the trustees have a direct interest in the fees paid to FMR, making the board evenly divided between financially interested and financially disinterested trustees for purposes of the second count. An evenly divided board does not excuse demand. *See* Section II *supra*. Plaintiff's three other reasons are similarly unavailing. As in count one, it is insufficient for plaintiff to assert that the other trustees acquiesced in the establishment of the fee structure. Certainly "there is no facial impropriety in determining payment by a formula." *In Re Kauffman, supra* at 266.[23] Had plaintiffs made a factual showing in the pleadings that the fees paid to FMR and Services were grossly excessive by the standards of the industry, a closer question on demand would be presented. Once the conclusory allegations of overpayment and breach of

fiduciary duty are set aside, however, the complaint alleges nothing but the execution of a contract for fees. Bias cannot be imputed to the two disinterested trustees for approving such a contract.

To avoid the *Kauffman* demand requirements, plaintiff relies on *Boyko v. Reserve Fund, Inc.*, 68 F.R.D. 692 (S.D.N.Y.1975). This court declines to follow *Boyko*. There, a shareholder of a mutual investment company similar to FDIT brought a derivative action under § 36(b).[24] To excuse demand, plaintiff alleged that the trustees were controlled by the investment adviser, had participated in the challenged transactions, and would be hostile to the action.

As the *Boyko* court acknowledged, plaintiff's allegations excusing demand were clearly insufficient under the *Kauffman* standards. 68 F.R.D. at 694. The court noted, however, that *Kauffman* preceded the enactment of Section 36(b), and ruled that the *Kauffman* standards should not apply to actions brought under that section. The court held that

> where there is at least one affiliated or interested director on the board of a mutual fund, the futility of making a demand on the entire board in an action brought by a shareholder pursuant to Section 36(b) will be presumed.

68 F.R.D. at 696.

Noting that Section 36(b) does not expressly authorize an action for the recovery of excessive fees by the investment fund itself, the *Boyko* court concluded that the investment company was barred from such an action. In that court's view, Congress had assumed that the directors of the fund

---

**22.** As explained in the text, the count must be dismissed against all defendants for failure to comply with Rule 23.1. Even if plaintiff had complied with the rule, however, the § 36(b) action would have to be dismissed as to defendants McKenzie and Spaulding. The statute authorizes suit only against certain designated persons. Defendants McKenzie and Spaulding, who own no interest in FMR, are not among those persons described in the statute. 15 U.S.C. § 80a–35.

**23.** According to the Senate Report on the Investment Company Amendments Act of 1970, advisers' fees "are usually calculated at a percentage of the funds' net assets and fluctuate

with the value of the funds' portfolio." Sen. Rep. No. 91–184, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News, pp. 4897, 4901.

**24.** The allegations were quite similar to those in the instant case. The investment fund's adviser was compensated by a fee based on a flat percentage of the fund's assets. Plaintiff charged that the compensation received was grossly excessive in light of the mushrooming growth of the fund's assets, and "the minimum number of investment judgment decisions . . . required from the [investment adviser]." 68 F.R.D. 692, 693 (S.D.N.Y.1975).

would be antagonistic toward such an action, and unlikely to prosecute it.

The *Boyko* court argued that its holding "does not undermine the policy underlying Rule 23.1 . . ." 68 F.R.D. at 696. This court disagrees. Many investment funds have at least one interested director.[25] The *Boyko* holding makes the demand requirement of Rule 23.1 an empty formality. In place of the particularity of allegation mandated by the rule, shareholders launching derivative actions without demand would simply name an interested director as a defendant.

■ Congress has the power, of course, to enact statutes which supersede conflicting provisions of the Federal Rules of Civil Procedure. *United States v. Gustin-Bacon Div. Certain-Teed Products Corp.*, 426 F.2d 539 (10th Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 63, 27 L.Ed.2d 63 (1970). Unless congressional intent to do so is clear, however, "a subsequently enacted statute should be so construed as to harmonize with the Federal Rules if that is at all feasible." 2 Moore's Federal Practice § 86.05 at 86–22.

■ This court finds no congressional intent to supersede Rule 23.1 in § 36(b) of the Investment Company Act. Although the statute meticulously catalogues a variety of procedural provisions,[26] it is silent on Rule 23.1. When Congress has chosen to modify the application of the rule to a statute, it has generally expressed its intention clearly.[27] To assume that Congress spoke *sub silentio* would require strong indicia of legislative intent. Here the pertinent legislative history, while inconclusive, tends to suggest a concern that Rule 23.1 be applied to the statute with customary vigor.[28]

Congress has demonstrated concern over the potential for self-dealing between mutual investment funds and their advisers. In regulating the industry, Congress has insisted that a certain proportion of the investment fund board be disinterested, 15 U.S.C. § 80a–(10)(a, d), and that these individuals review the contracts for fees to the investment advisers. 15 U.S.C. § 80a–(15)(c). When Congress has rested such responsibility on the shoulders of the unaffiliated directors, it would be anomalous to assume they are captive to the interests of the investment advisers.[29]

■ *Boyko* assumed that directors were incapable of asserting their own § 36(b)

---

**25.** Note, *Duties of the Independent Director in Open-End Mutual Funds*, 70 Mich.L.Rev. 696, 700 (1972).

**26.** Among other provisions, the statute excuses plaintiff from proving personal misconduct on the part of any defendant; permits consideration by the court of ratification of compensation contracts by shareholders; and limits damages to "actual damages", recoverable only for the period one year prior to the initiation of the action. 15 U.S.C. § 80a–35(b)(1–3).

**27.** *See e. g.* 15 U.S.C. § 78p(b) (allowing suit by the owner of any security of the issuer in the name and on behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request).

**28.** The Chairman of the SEC, responding to fears that the proposed legislation would open the door to unjustified strike suits, reported:
We do not believe that this would leave the door wide open to nuisance actions. As we have pointed out previously, there are adequate safeguards under the Federal Rules of Civil Procedures [sic] and under this bill to prevent unjustified shareholder litigation.
Hearings on H.R. 11995, S. 2224, H.R. 13754 and H.R. 14737, before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 91st Cong., 1st Sess. 201 (1969).
The SEC Chairman also testified, "There are already in [the bill] and in the FRCP sufficient safeguards against frivolous or harassing lawsuits." *Id.* at 860 (footnote omitted). Although the Chairman was referring at that time to Rule 23, Rule 23.1 is similarly designed to prevent harassment suits.

**29.** *Kauffman* commented at some length on this question:
Nor do we think that an exception is to be made in the case of unaffiliated directors of a mutual fund on the ground that since they are expected to be sensitive to misconduct of this variety they are automatically incapacitated from performing their duties—their approval or acquiescence making them "wrongdoers"—once a stockholder alleges a corporate injury stemming from the adviser-fund relationship. Apart from the fact that this, again, would enable a plaintiff to try his case on the merits in order to determine whether he had a right to bring it, it would be a misconception of the nature of unaffiliated directors. Normally self-dealing by any corporate directors is suspect. Congress recog-

action, and that demand was therefore futile. Even if directors do in fact lack the capacity to sue under Section 36(b), they should be given the opportunity to take the other courses of action available to them to remedy the wrong.[30]

Plaintiff has failed to meet the requirements of Rule 23.1 for either of his two counts. His motion to file the "Second Amended and Supplemental Complaint" is denied, and judgment entered for defendants. An order will issue.

## APPENDIX: PRIOR ORDER OF May 17, 1977.

This is a shareholder's derivative suit alleging violations of the Investment Com-

---

nized, however, that a certain type of self-dealing is endemic in a mutual fund, and must be permitted. In order to make sure that the directorate not be top-heavy, it provided for a minimum number of directors who would not be so interested. We do not believe it should follow from this that, as directors required to be disinterested in a particular transaction, they differ in their fiduciary obligations from a disinterested directors in any other corporate venture. All disinterested directors must "act honestly and according to their best judgment for the interests of all." *Corbus v. Alaska Treadwell Gold Mining Co.*, 1903, 187 U.S. 455, 463, 23 S.Ct. 157, 160, 47 L.Ed. 256. When corporate action, or inaction, is subsequently challenged, their duty is not extinguished, but, rather, refocused. After a demand provides them with "full knowledge of the basis for the claim," *Halprin v. Babbitt*, 1 Cir., 1962, 303 F.2d 138, 141, it is for the directors, who have "the advantage of familiarity with the enterprise, with those who have conducted it and with the record of success or failure" to decide on the appropriate corporate response. *Pomerantz v. Clark*, 101 F.Supp., at 344. To the extent that they are "watchdogs" they should be given the opportunity, not deprived of it.
479 F.2d at 266–67.

Plaintiff has directed this court's attention to the Second Circuit's recent decision, *Lasker v. Burks*, 567 F.2d 1208 (2d Cir. 1978). In *Lasker*, the court held that independent minority directors of a registered mutual fund cannot terminate a nonfrivolous stockholder's derivative action against the fund's majority directors and its investment adviser.

The opinion does not address the requirement of demand on the board of directors, and comments that Rule 23.1 cases are inapposite. 567 F.2d at 1212. *Lasker's* holding is not in conflict with the decisions of this Circuit. As *Heit v. Baird* noted,

> The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation, and the normal presumptions running in favor of those acting for the company, this seems only reasonable. *Resort to the board, even assuming the di-*
> *rectors should turn down plaintiff's demand, would not necessarily preclude suit thereafter.*

*Heit v. Baird, supra* at 1162 (emphasis added). To the extent that *Lasker* assumes the independent directors to be captive to the will of the interested directors, this court disagrees.

30. Whether directors have the capacity to bring a Section 36(b) action is an unsettled question. The statute makes explicit reference only to actions by the SEC and by shareholders, and the Senate Report states:

> Under this proposed legislation either the SEC or a shareholder may sue in court on a complaint that a mutual fund's management fees involve a breach of fiduciary duty.

Sen.Rep. No. 91–184, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News, pp. 4897, 4903.

On the other hand, courts have sometimes created private rights of action under the securities laws absent explicit legislative authorization. *See J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Substantial considerations of policy would seem to commend a 36(b) action by directors, who are best equipped to prosecute the suit by virtue of their intimate knowledge of the contractual arrangement. As the Senate Report on the Amendments to the Investment Company Act states,

> These provisions highlight the fact that the section is not designed to ignore concepts developed by the courts as to the authority and responsibility of directors. Indeed, this section is designed to strengthen the ability of the unaffiliated directors to deal with these matters and to provide a means by which the Federal courts can effectively enforce the federally-created fiduciary duty with respect to management compensation. The section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary.

Sen.Rep. No. 91–184, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News, pp. 4897, 4903.

Even if directors are barred from a Section 36(b) action, other measures are available to them to remedy the wrongdoing. They may, for example, have a common law contract action. They may also have the kinds of compromise actions specified *supra* n.18.

pany Act of 1940 by the defendant trustees of Fidelity Daily Income Trust. Defendants have moved to dismiss under Fed.R. Civ.P. 23.1 on the grounds that plaintiff has failed to make demand upon the Board of Trustees of Fidelity Daily Income Trust to institute or prosecute this action, and that he has failed to allege with particularity sufficient reasons for his failure to make such demand. In his complaint, the plaintiff pleaded that he had not made a demand upon the trustees to bring this action. The court finds that the plaintiff has not shown, by more than bare allegation, that a demand would have been futile. *Lerman v. I. T. B. Management Corp.*, 58 F.R.D. 153 (D.Mass.1973). Accordingly, the court ORDERS that the motion of the defendants to dismiss under Fed.R.Civ.P. 23.1 be granted, and that judgment be entered for the defendants.