567 F.2d 1208
 Fed. Sec. L. Rep. P 96,282
Howard M. LASKER and Irving Goldberg, Plaintiffs-Appellants,
v.
Harry G. BURKS, Jr., Edward B. Burr, Thomas F. Chalker, John
R. Haire, Harvey C. Hopkins, S. P. Hutchison, Donald L.
Kemmerer, A. S. Mike Monroney, Charles F. Phillips, Jeptha
H. Wade, Anchor Corporation and Fundamental Investors, Inc.,
Defendants-Appellees.
 No. 23, Docket 77-7060.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 31, 1977.
Decided Jan. 11, 1978.
 
 Anthony L. Tersigni, New York City (Aranow, Brodsky, Bohlinger, Benetar & Einhorn, Steven Mallis, Herbert A. Einhorn, David J. Sweet and Richard N. Gray, New York City, on brief), for plaintiffs-appellants.
 Daniel A. Pollack, New York City, for defendants-appellees.
 Seward & Kissel, Eugene P. Souther and Anthony R. Mansfield, New York City, on brief, for defendant-appellee Fundamental Investors, Inc.
 Pollack & Kaminsky and Martin I. Kaminsky, New York City, on brief, for defendants-appellees Anchor Corp., Edward B. Burr, Thomas F. Chalker, John R. Haire and S. P. Hutchison.
 Dewey, Ballantine, Bushby, Palmer & Wood, Leonard Joseph, John M. Friedman, Jr., New York City, on brief, for defendants-appellees Harry G. Burks, Jr., Harvey C. Hopkins, Donald L. Kemmerer, A. S. Mike Monroney, Charles L. Phillips and Jeptha H. Wade.
 Before LUMBARD, OAKES and MESKILL, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 This appeal by two mutual fund shareholders raises an important question of first impression: can minority directors of a registered mutual fund, who were nominated by the majority directors of the fund to be " independent" directors pursuant to the requirements of the Investment Company Act, 15 U.S.C. § 80a-10(a), terminate a nonfrivolous stockholder's derivative action against the fund's majority directors and its investment adviser? We are of the view that to permit such action by those "independent" minority directors of a registered mutual fund would be contrary to the public interests which Congress has sought to protect. Accordingly, we reverse the judgment of the district court which dismissed the complaint and remand for further proceedings.
 
 
 2
 Howard Lasker and Irving Goldberg commenced this derivative action in February, 1973, against individuals who had been directors of Fundamental Investors, Inc. (the Fund), an open-end investment company[1] registered under the Investment Company Act, 15 U.S.C. § 80a-1 to -52, and the Fund's registered investment adviser, Anchor Corporation. The plaintiffs sought to recover losses sustained by the Fund in connection with its purchase between November 28 and December 8, 1969, of $20 million in Penn Central 270-day notes from Goldman, Sachs & Co. The derivative complaint charged the defendants with violations of §§ 13(a)(3) and 36 of the Investment Company Act, 15 U.S.C. §§ 80a-13(a)(3), 80a-35 (1970), breach of their common-law fiduciary duties, violations of § 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6 (1970), and breach of Anchor's investment advisory contract with the Fund.
 
 
 3
 It is undisputed that Anchor never made any independent investigation of Penn Central's financial situation before the Fund's purchase of the notes. Moreover, although reports of Penn Central's operations in early 1970 showed mounting losses, it was not until May that the Fund officers made any attempt to resell any part of the notes to Goldman, Sachs, or otherwise to realize on the investment. On June 21, 1970, Penn Central filed a petition for reorganization which is still in process in the Eastern District of Pennsylvania. Consequently, the Fund's Penn Central notes were not paid at maturity.
 
 
 4
 In November 1970, the Fund, joined by three other noteholders,[2] sued Goldman, Sachs in the Southern District of New York for recovery of their losses arising from their purchases of Penn Central notes. In July 1973, then District Judge Gurfein stayed the instant action, which had been commenced five months earlier, pending resolution of the suit against Goldman, Sachs. That suit was settled on behalf of the Fund in July 1974. Under the settlement, Goldman, Sachs took back the Fund's Penn Central notes, paid the Fund $5,250,000, and assigned to the Fund a 73.75 percent interest in the proceeds of the notes in the reorganization proceedings. The Fund's co-plaintiffs did not settle, and the jury rendered verdicts in their favor against Goldman, Sachs for the full amount of their claims.[3]
 
 
 5
 On July 24, 1974, the Fund's board of directors met and discussed the pending Lasker case. They decided that five of the statutorily disinterested directors, none of whom were involved in the derivative action,[4] should decide what action should be taken regarding the Lasker case, and act accordingly on behalf of the entire board.[5] This procedure had been discussed prior to the July board meeting by the defendant John R. Haire, president of the Fund and chairman of Anchor's board of directors, and Roger Wickers, an officer of both the Fund and Anchor. Upon Haire's instruction, Wickers had ascertained that Stanley H. Fuld, former chief judge of the New York Court of Appeals, would be available to serve as special counsel. The minority directors agreed to consider what should be done about the Lasker case, and instructed Wickers to retain Judge Fuld to advise them.
 
 
 6
 Judge Fuld, in his report of December 5, 1974, supplemented on December 18, 1974, concluded, on the basis of the information furnished to him, that neither Anchor nor the Fund directors would be found liable under federal or state law. At the same time, Judge Fuld pointed out the absence of legal authority on whether a mutual fund's investment adviser is required to conduct independent research regarding its investment recommendations. He further cautioned that it was "impossible to predict . . . what a trier of fact will find, particularly in complex circumstances." After considering the special counsel's reports, on January 6, 1975, the minority directors instructed counsel for the Fund to seek dismissal of the Lasker action on the ground that it was their business judgment that further prosecution of the action would not be in the best interests of the Fund.
 
 
 7
 Judge Werker, in passing on the motion to dismiss, held that the minority directors, in the exercise of their business judgment, had the power to bar further prosecution of the case, provided they were truly disinterested and independent. As a factual issue had been raised regarding whether the minority directors were independent and disinterested, he granted discovery on that issue. Lasker v. Burks, 404 F.Supp. 1172 (S.D.N.Y.1975). After such discovery, the motion to dismiss was renewed and granted by Judge Werker on January 7, 1977. In his second opinion, 426 F.Supp. 844 (S.D.N.Y.1977), Judge Werker found no factual support for the conclusion that the minority directors had not acted independently. In accordance with his earlier opinion, he dismissed the complaint.
 
 
 8
 From what this record discloses regarding the Fund's investment in Penn Central notes on Anchor's advice, we cannot say that, following a trial on the merits, the defendants would be found free from liability for the Fund's losses. We see nothing in the findings of Congress, the legislation regulating investment companies and their advisers, or in the decisions of the courts which suggests that under such circumstances disinterested directors, such as the five who acted here, have the power to terminate litigation brought by mutual fund stockholders against the fund's investment adviser and its majority directors for breach of their fiduciary duties. On the contrary, the findings of Congress, the statutory scheme, and the relevant case law persuade us that the statutorily disinterested directors of a registered investment company were never meant to have the final word in determining whether it is in the best interest of a mutual fund to press claims against their co-directors, and the adviser with which those directors are affiliated, for breach of fiduciary duties.
 
 
 9
 In response to disclosure of grave abuses in the management of investment companies, Congress in 1940 enacted the Investment Company Act (ICA), 15 U.S.C. §§ 80a-1 to -52 (1970), and the Investment Advisers Act (IAA), 15 U.S.C. §§ 80b-1 to -21 (1970). Congress acted after receiving a report from the Securities and Exchange Commission which showed that investment funds were organized by investment advisers; that the funds were administered under contracts that where highly favorable to the advisers; that the directors of the funds were selected by the investment adviser; and that the board was usually dominated by persons affiliated with the adviser.[6] Congress found that numerous practices in the management of such funds adversely affected the national public interest and the interest of investors. Accordingly, Congress declared it to be the policy and purpose of the ICA to mitigate and eliminate those aspects of the conduct and administration of the funds which benefitted the managers and adversely affected the stockholders of the fund.[7]
 
 
 10
 The ICA provides that no more than 60% Of a registered company's board of directors can be "interested persons" affiliated with the investment adviser.[8] Moreover, it gives the statutorily disinterested directors, usually referred to as "independent directors," certain powers to supervise management and auditing arrangements.[9] Thus, section 15(c) of the ICA,15 U.S.C. § 80a-15(c) (1970), imposes on the disinterested directors the duty to review and approve the contracts of the investment adviser and the principal underwriter; section 16(b), 15 U.S.C. § 80a-16(b) (1970), provides that the statutorily disinterested directors will appoint other disinterested directors to fill vacancies resulting from the assignment of the advisory contracts; and section 32(a), 15 U.S.C. § 80a-31(a) (1970), requires that the accountants who prepare the investment company's Securities and Exchange Commission financial filings be selected by the statutorily disinterested directors. We conclude, therefore, that the statutes were designed to interpose statutorily disinterested directors as a check on the actions of the majority directors controlled by the investment adviser. It would be contrary to the legislative purpose to permit the independent minority to be used to approve majority action so that no stockholder complaint could survive that approval.
 
 
 11
 Congress has not been satisfied, moreover, that the presence of disinterested directors who observe their duties will be sufficient protection to the stockholders, as it has specifically provided in section 36(b) that shareholders may sue derivatively to recover excessive fees paid to the adviser and the principal underwriter. See 15 U.S.C. § 80a-35(b) (1970). Section 36(b) was enacted as a part of the 1970 amendments, which resulted in part from the Senate report which indicates that the mere presence of disinterested directors on the boards of mutual funds was not sufficient to protect funds against overreaching investment advisers.[10]
 
 
 12
 We have been sensitive to the need for protection of the public interest in accordance with the views of Congress. Thus, in Galfand v. Chestnutt, 545 F.2d 807 (2d Cir. 1976), we found that the investment adviser had abused its position of trust by securing a favorable modification of its advisory contract without fully disclosing to the fund's directors the ramifications of the changes. Writing for the panel, Chief Judge Kaufman observed that, "(t)he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest. The typical fund ordinarily is only a shell, organized and controlled by a separately owned investment company adviser, which selects its portfolio and administers its daily business." Id. at 808. See also Tannenbaum v. Zeller, 552 F.2d 402 (2d Cir. 1977).
 
 
 13
 Moreover, in many instances where no specific authority is granted by statute the courts have inferred that stockholders may bring suit. See, e. g., Abrahamson v. Fleschner, --- F.2d ---- at ---- (2d Cir. Feb. 25, 1977) and cases cited therein. It would surely be anomalous to hold that the statutorily disinterested directors could determine not to pursue litigation against their co-directors for liability which may amount to many millions of dollars, and foreclose the stockholders from continuing such litigation, while at the same time stockholders by statute are empowered to recover excess fees paid the adviser and underwriter.
 
 
 14
 In the ordinary routine of running an investment trust, the disinterested directors must constantly deal with interested directors in a spirit of accommodation. Indeed, they are compelled for the most part to rely on the information and expert advice provided by the adviser and the majority directors.[11] The continued service of the statutorily disinterested directors, for which in this case they were paid from $11,000 to $13,000 per annum,[12] depends almost entirely on the establishment of satisfactory working arrangements between them and the majority responsible for their selection. It is asking too much of human nature to expect that the disinterested directors will view with the necessary objectivity the actions of their colleagues in a situation where an adverse decision would be likely to result in considerable expense and liability for the individuals concerned.[13] Correspondingly, it cannot be expected that the public or the Fund's stockholders would believe that these five statutorily disinterested directors could act with that impartiality and objectivity which the public interest requires. It follows that disinterested directors of an investment company do not have the power to foreclose the continuation of nonfrivolous litigation brought by shareholders against majority directors for breach of their fiduciary duties. Of course here we do not reach the question of whether a court should defer to the decision of statutorily disinterested directors of an investment company to terminate a shareholder derivative suit which the court finds to be frivolous.
 
 
 15
 Our conclusion makes it unnecessary to consider the findings of the district court that the disinterested directors were sufficiently independent to determine that the litigation be ended.[14] We have no doubt that the five minority directors acted in good faith in all that they did.
 
 
 16
 Reversed and remanded for further proceedings.
 
 
 
 [1]
 An open-end investment company is defined in § 5(a)(1) of the Investment Company Act, 15 U.S.C. § 80a-5(a)(1) (1970), as an investment company that offers "for sale or has outstanding any redeemable securities of which it is the issuer." "Investment company" is defined in § 3(a) of the Act, 15 U.S.C. § 80a-3(a) (1970)
 
 
 [2]
 In addition to the Fund, Welch Foods, Inc., C. R. Anthony Company, and Younker Brothers, Inc. sued Goldman, Sachs in a single action. See Welch Foods Inc. v. Goldman, Sachs & Co., 398 F.Supp. 1393 (S.D.N.Y.1974)
 
 
 [3]
 See Welch Foods Inc. v. Goldman, Sachs & Co., 398 F.Supp. 1393 (jury verdict S.D.N.Y.1974)
 
 
 [4]
 Of the remaining six directors of the eleven member board, all were defendants to the Lasker action and/or affiliated with Anchor
 
 
 [5]
 Under the Fund's bylaws and Delaware corporate law, five of the Fund's twelve member board of directors constituted a quorum of the entire board. Del.Code tit. 8, § 141 (1975); Fundamental Investors, Inc., Certificate of Incorporation, Article EIGHTH; Fundamental Investors, Inc., Bylaws section 4, Article VI
 The five directors appointed to review the Lasker action were: Leon Kendall, elected to the board in June 1974; Beryl Robichaud, elected in September 1973; William Stephens, elected in September 1973; Mary O'Connor, elected in June 1972; and Louis Laun, who became a director in the fall of 1971.
 
 
 [6]
 See SEC, Report on the Study of Investment Trusts and Investment Companies, pt. 3, 1-49, 1922 (1940). See also Comment, Duties of the Independent Directors in Open-End Mutual Funds, 70 Mich.L.Rev. 696, 701 (1972)
 
 
 [7]
 See 15 U.S.C. § 80a-1 (1970)
 
 
 [8]
 See 15 U.S.C. §§ 80a-10, 80a-2(a)(3), (19) (1970)
 
 
 [9]
 See generally Comment, Duties of the Independent Director in Open-End Mutual Funds, 70 Mich.L.Rev. 696 (1972)
 
 
 [10]
 See 1970 U.S.Code Cong. & Admin.News, pp. 4897, 4901. In 1970 both the ICA and the IAA were substantially amended. See Act of December 14, 1970, Pub.L. No. 91-547, 84 Stat. 1413
 
 
 [11]
 See Comment, supra note 9, at 702
 
 
 [12]
 In addition to their role as directors of the Fund, each of the five minority directors served on the boards of five other Anchor affiliated funds, and all but one of the directors sat on a sixth Anchor related board
 
 
 [13]
 See Fogel v. Chestnutt, 533 F.2d 731, 750 (2d Cir. 1975); Nutt, A Study of Mutual Fund Independent Directors, 120 U.Pa.L.Rev. 179, 216 (1971)
 
 
 [14]
 Similarly, the plethora of cases cited by counsel dealing with the powers of boards of directors to terminate stockholder derivative suits and the effect of the demand requirement under Fed.R.Civ.P. 23.1 are inapposite. We base our decision on the unique nature of the investment company and its symbiotic relationship with its investment adviser; we need not reach questions of the exercise of similar power by directors of other types of corporations. Moreover, none of these cases involves the situation here, where the terminating directors owe their position as directors to the defendants in the suit