RESERVE MANAGEMENT CORPORA-
TION and Argyle Arbitrage,
LTD., Plaintiffs,

v.

ANCHOR DAILY INCOME FUND, INC.,
Anchor Corporation, Cash Management
Trust of America, Capital Research and
Management Company, Edward B. Burr,
John R. Haire, S. P. Hutchinson, Melvin
Intriligator, Leon T. Kendall, Louis F.
Laun, Mary S. O'Connor, Charles F.
Phillips, Beryl Robichaud, William J.
Stephens, and Walter P. Stern, Defend-
ants.

No. 78 Civ. 3826 (KTD).

United States District Court,
S. D. New York.

Sept. 28, 1978.

Alexander & Green, New York City, for plaintiffs; Robert E. De Right, Jr., Robert L. Osar, New York City, of counsel.

Shearman & Sterling, New York City, for defendant Anchor Daily Income Fund; Richard P. Lasko, New York City, of counsel.

Pollack & Kaminsky, New York City, for defendants Anchor Corp., Burr, Haire, Hutchinson, and Intriligator; Daniel A. Pollack, T. Barry Kingham, Kenneth A. Zitter, New York City, of counsel.

Sullivan & Worcester, Boston, Mass., for defendants Phillips, Laun, O'Connor, Stephens, Kendall, and Robichaud; John A. Dudley, Boston, Mass., of counsel.

White & Case, New York City, for defendants Capital Research and Management Co. and Walter P. Stern; Peter M. Collins, New York City, of counsel.

O'Melveny & Myers, Los Angeles, Cal., for defendant Cash Management Trust of America; Richard C. Warmer, Los Angeles, Cal., of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

This is a case involving the business judgment of the independent directors of a mutual fund who, upon the withdrawal of their management, were faced with the task of investigating and thereafter determining which proposals of prospective managers should be submitted to the fund shareholders for their consideration. Plaintiff, Reserve Management Corporation [hereinafter referred to as "RMC"] is the disappointed suitor who sought to take over the management of the defendant Anchor Daily Income Fund, Inc. [hereinafter referred to as "ADI Fund"]. The other plaintiff, Argyle Arbitrage, Ltd. [hereinafter referred to as "Argyle"] is a nominee for Bruce Bent and Henry Brown who are the principals of RMC. Argyle was used by Messrs. Bent and Brown to keep tabs on other mutual funds concerning the efficiency of investment and redemption of various money-market funds in competition with the fund managed by RMC.

Before setting out the facts relevant to this matter, a few words must be said about the posture of the case before me. This is not a class action, nor has anyone suggested in any way, at any time that it be certified

**600**

as a class action. The plaintiffs herein, RMC and Argyle, are suing solely on their own behalf. While the complaint is couched in terms seeking an injunction for alleged violations of the Securities Exchange Act of 1934, the Investment Company Act, and the Investment Advisers Act, in reality RMC is seeking the opportunity to capture the management fees of ADI Fund, while Argyle seeks to force ADI Fund to resolicit its shareholders in order that RMC might capture the investment advisors fees which would be charged against the ADI Fund. This was well borne out at the hearing when the plaintiffs complained that they did not have the list of the names and addresses of ADI Fund investors. Such lists are jealously guarded within the mutual fund industry since they give a great advantage to a fund as to whom to solicit as potential customers.

I

BACKGROUND OF THE PARTIES

A. Reserve Management Corporation.

Reserve Management Corporation was one of the very first of the investment advisors to promote a money-market fund whereby investors could trade through a mutual fund in the volatile money-market of the 1970's. While RMC suggests that the funds within its control were high-performance oriented throughout its management and that it provided outstanding efficiency of investment and redemption, there was evidence produced at the hearing indicating that RMC was not the leader in the money-market field that Messrs. Bent and Brown would have this Court believe.

It was apparent to me, as a result of the hearing held herein, that Messrs. Bent and Brown were the soul and sinew of RMC. It was also evident that neither individual had any substantial experience outside of the money management investment advisory field, although Brown claimed to have been the investment advisor for a pension fund at one time.

RMC, Bent and Brown have been the subject of scrutiny by the Securities and Exchange Commission and the Commission, charged with the regulation of investment companies and investment advisors, has made certain findings and an order imposing remedial sanctions naming all three as respondents. That order, dated June 27, 1977, was entered by way of an offer of settlement wherein the respondents agreed, without admitting or denying the allegations of the order for proceedings, to submit to certain sanctions.

It was specifically found by the SEC that

Brown and Bent willfully caused, aided and abetted willful violations by RMC of Section 15(a) of the Investment Company Act, RMC, Brown and Bent willfully caused, aided and abetted violations of Section 15(c) and 32(a) of the Investment Company Act and RMC, Brown and Bent *willfully violated and willfully aided and abetted violations of Section 20(a) and 34(b) of the Investment Company Act and* Rule 20a–1 thereunder . . . .

The order further provides:

It is ordered that for a period of 60 days:

1. The registration of RMC as an investment advisor be, and, it hereby is suspended; and

2. Brown and Bent be, and they hereby are, suspended from being associated with any investment advisor; and

3. RMC, Brown and Bent be, and they hereby are, prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment advisor or depositor of, or principal underwriter for, any registered investment company or affiliated person such an investment advisor, depositor or principal underwriter, provided that such sanctions be, and they hereby are, suspended and not imposed if, for a period of 3 years from the date of this order, RMC, Brown and Bent comply, in all material respects, with all of the undertakings set forth in their offer of settlement . . . .

While no one offered in evidence the stipulation or offer of settlement entered into by Bent, Brown and RMC, a number of its provisions became clear through the testimony elicited at the hearing. Bent, Brown and RMC were required to repay certain of the investment advisory fees to the investment company under their management and to waive such fees totalling about $1,400,000. Bent and Brown tried to pass these matters off as merely technical violations but these sanctions clearly were not immaterial nor imposed for merely "technical" violations.

### B. Argyle Arbitrage, Ltd.

As pointed out already, Argyle Arbitrage, Ltd. is nothing more than a nominee for Bent and Brown and used by them as a vehicle to obtain information as to other money management funds. At one time, it owned units of ADI Fund totalling $2,500; but its interest has now been reduced to $515.

### C. The Anchor Corporation.

The Anchor Corporation is an investment advisor registered with the Securities and Exchange Commission. It has rendered investment supervisory and corporate administrative services to various funds including the ADI Fund under terms of an advisory agreement. Among the other funds which were serviced by Anchor were Fundamental Investors, Inc., Anchor Growth Fund, Inc., Washington National Fund, Inc., Anchor Income Fund, Inc. and Anchor Spectrum Fund, Inc. The Anchor Group is not unknown to this Court. *See Lasker v. Burks*, 567 F.2d 1208 (2d Cir. 1978).

### D. The Anchor Daily Income Fund, Inc.

The Anchor Daily Income Fund, Inc. is a money-market mutual investment company. As of April 30, 1978, the Anchor Daily Income Fund, Inc. had net assets of $32,-166,000. and a net asset value per share of $1.

### E. Cash Management Trust of America.

Cash Management Trust of America is a Massachusetts business trust and a money-market fund with assets of approximately $16,000,000. as of April 30, 1978. The value per share of this fund was also $1.

### F. Capital Research and Management Company.

The Capital Research and Management Company, founded in 1931, is an investment advisor to twelve mutual funds, known collectively as the American Funds Group, and to two funds whose shares may be owned only by tax-exempt organizations. The funds in the American Funds Group had an aggregate net asset of approximately 2.8 billion dollars as of April 30, 1978.

### G. The Individual Defendants.

With the exception of Walter P. Stern, the individual defendants collectively constituted the Board of Directors of each of the various Anchor Funds and more specifically, of the Anchor Daily Income Fund until on or about August 1, 1978.

The defendant, Walter P. Stern, has been a director of the ADI Fund since on or about August 1, 1978, and is an affiliated person with the Capital Research and Management Company and thus, an "interested person" as that term is defined in the Investment Advisers Act.

The defendants, Leon T. Kendall, Louis F. Laun, Charles F. Phillips, Mary S. O'Connor, Beryl Robichaud and William J. Stephens are the "outside, independent" or "disinterested directors" of the ADI Fund.

## II

### BACKGROUND OF THE ACTION

At the beginning of 1978, the Anchor Corporation indicated to the Anchor Group of Funds that it was desirous of terminating its investment company management functions. Accordingly, the outside directors of the various Anchor Funds set up a contract committee to seek a replacement for the advisory services provided by the

now withdrawing Anchor Corporation.[1] To this end, the outside directors decided to hire an independent outside counsel representing them to assist in finding a replacement investment advisor. After some preliminary investigation, the independent directors contacted and retained John A. Dudley, Esq. Mr. Dudley was asked to take the lead in setting up guidelines whereby the independent directors could investigate a new investment advisory corporation. Before the first meeting with Mr. Dudley, the independent directors had already established several criteria basic to their consideration of a new investment advisory organization. These criteria included the following: (1) any proposed organization should have an established record of successful money management, particularly achievements in managing equity securities; (2) preference would be given to an organization which had a demonstrated successful experience of managing a large complex of mutual funds the size of which was comparable to the assets and investment policies to the Anchor Group; (3) the fees of the proposed organization would be comparable to or lower than Anchor's fee structure; and (4) any proposed organization should be financially sound and possess the operational expertise to assure continuation of all the many services needed for successful management of a large mutual fund complex.

Since the Capital Research and Management Company had already been recommended to the ADI Fund outside directors by the Anchor Corporation, much of the outline paralleled the actualities found by Mr. Dudley's subsequent investigation of Capital Research and Management Company.

On February 10th it was publicly announced and reported in the Financial Press that Anchor and Capital Research had reached an agreement in principle whereby Anchor would transfer its advisory and distribution services with regard to the Anchor Group to Capital Research. The Agreement, of course, was made contingent upon approval by the Boards of Directors of the various Anchor Funds and also by the shareholders of these funds.

On or about February 22, 1978, the outside directors of the Anchor Funds met with Mr. Dudley and considered the guidelines which he had prepared. The Board, upon modification of Dudley's submissions, propounded a substantial and detailed document ten pages in length. Apparently, this document was sent to Capital Research and Management Company and answers were obtained to the questions raised in the body of the guidelines.

Thereafter, three of the independent directors visited the offices of Capital Research and partook in a meeting which lasted approximately 8 hours. On March 22, 1978, the independent directors met and the three directors who had visited Capital Research made a report. The answers of Capital Research to the guideline questionnaire were also reviewed by all of the ADI Fund independent directors. The next meeting of the independent directors occurred on April 3, 1978, when they reviewed material prepared by an independent business consultant retained by the directors concerning Capital Research. Also present were representatives of Anchor and Capital Research who were asked specific questions by the independent directors. These directors then met separately with their special counsel and unanimously voted in favor of recommending to all the Boards of Directors of the Anchor Group of Mutual Funds that each Board recommend shareholder approval of Capital Research as replacement for Anchor.

On April 26, 1978, the independent directors again met and considered additional information furnished by Anchor and the specific terms of the proposed investment advisory and underwriting contracts with Capital Research. They also considered a proposed merger of certain of the Anchor Group of Mutual Funds into comparable funds in the group already being serviced by Capital Research.

---

1. Whether the impetus for this decision came from the Anchor Corporation or from the disinterested directors of the Funds is of no importance to this decision.

In particular, there was considered the proposed merger of the ADI Fund into the Cash Management Trust of America, the money-market fund of the American Funds Group.

The agreements with Capital Research and Management Company and the various Funds of the Anchor Group provided that upon consummation of the Agreement, none of the directors (including the independent directors) would be continued in their positions.

## III

## THE TRANSACTIONS IMMEDIATELY GIVING RISE TO THIS LAWSUIT

On May 18, 1978, RMC wrote to the independent directors of all of the Anchor Group of Funds making what was to be the first of two RMC offers by indicating that RMC was interested "in assuming the management and distribution of the Anchor Funds." The three-page RMC offer included the following terms, among others:

(a) continuation of employment in Elizabeth, New Jersey of existing Anchor investment management personnel wishing to remain, and continuation of the Anchor Funds' outside servicing organizations, such as custodian, transfer agent, auditors and legal counsel;

(b) continuation of the then-existing terms of the Anchor Advisory Agreements, except that RMC offered to provide investment management services without imposing an investment fee for a period of one year;

(c) the merger of the ADI Fund into Reserve Fund; and

(d) a change of sales practice with respect to each of the continuing Anchor Funds to a no-load basis, i. e., the elimination of any sales charge.

Affidavit of Henry B. R. Brown ¶ 12. Also included in the letter was an offer, directed to the "independent directors" of Anchor, that they continue in their present positions for all of the Anchor Group of Funds, with Messrs. Bent and Brown to become the affiliated directors of the funds. This, of course, differed substantially from the offer of Capital Research whereby the independent directors would give up their positions.

On May 24, 1978, the independent directors of the Anchor Group of Funds met for the purpose of considering the form of certain of the mergers proposed between the Anchor Group of Funds and the American Group. Also discussed at the meeting was the letter to the independent directors from RMC.

Apparently when this matter came up during the meeting, Mr. Dudley brought to the attention of the directors the SEC order, referred to above, involving RMC and Messrs. Bent and Brown. Moreover, since the independent directors had already discussed the poor investment results which had been achieved by the Anchor Group of Funds, the offer to continue "existing Anchor investment management personnel" apparently was unanimously rejected out-of-hand by the independent directors.

The independent directors instructed Mr. Dudley to prepare and circulate, for their approval, a letter in response to the RMC offer. Mr. Dudley was told to make clear to RMC that the directors did not believe it would serve any purpose to meet with the principals of RMC.

Mr. Dudley prepared the letter to RMC as requested and circulated it to the directors. Apparently, various phone calls were made among the directors and Mr. Dudley and a final draft of the letter was presented to a meeting of the independent directors and approved by them on June 14, 1978.

On the same date, special meetings of the Boards of Directors of the Anchor Group of Funds were held to consider the proxy material for the change in the advisors of the various funds and the proposed mergers of some of them into the American Group.

The proxy material sent to the shareholders of the various Anchor Funds dated from June 16, 1978 to June 30, 1978, did not mention the proposal of RMC.

On or about July 7, 1978, Bent and Brown, along with their counsel Carl Frischling, Esq. of Alexander & Greene,

Esqs., met with Mr. John Dudley apparently to complain that the RMC proposal had not been included in the proxies sent to the shareholders of the Anchor Group of Funds other than ADI Fund. Bent, Brown and Frischling, on behalf of RMC, charged that this constituted material omissions and apparently implied that legal action would be taken. Dudley insisted that there had been no material omission and that the proxies were in all respects proper.

Mr. Dudley also told the RMC people that the independent directors of the Anchor Group had turned down the RMC proposal for various reasons including their lack of investment experience in the equity area, their proposal that Anchor management retain its position in the equity area and the SEC Findings and Order against them. While the witnesses for RMC tried to portray Mr. Dudley as sympathetic to their explanation of the facts giving rise to the SEC order, it may have been that Dudley was merely trying to be polite in the face of their difficulties.

Apparently Bent and Brown then tried to interest Dudley in a severance of one item of their original proposal—i. e., a merger of ADI Fund into the money-market fund managed by RMC. When, however, the problem of the transferability of shares in the Anchor Group from "equity" funds to the money-market fund and vice versa was broached, it was suggested that such an arrangement could be worked out with the American Funds Group through Capital Research and Management Company. Who made the suggestion is unclear from the credible testimony, but what is clear is that Dudley gave the name of Mr. Ratzlaff an officer of Capital Research and Management Company, as a person who should be contacted to see if such an arrangement would be feasible.[2]

Dudley agreed to contact the independent directors of ADI Fund to tell them of this new proposal, but it is evident that he made it clear to the RMC representatives that this would be a difficult and time-consuming task since at least one of the directors was in Europe at the time and virtually incommunicado.

It is clear that at least by July 19, 1978, Argyle had received proxy material from ADI Fund. When it was viewed by Bent and Brown, as the principals of Argyle, they knew that no mention was contained therein concerning the second proposal of RMC to merge the ADI Fund into the Reserve Management Fund with transferability of shares with American Group of Funds. Although, at times, the plaintiffs have argued that this second proposal was merely a continuation of the first offer as far as ADI Fund is concerned, I find that as a matter of fact and of law the two proposals were separate and distinct. Indeed, in the complaint there is reference to "two RMC offers." Complaint ¶ 31. *See* Discussion, *infra*, at 601.

Even prior to the acknowledged receipt of this proxy material things had been moving apace. A representative of RMC had contacted Mr. Ratzlaff to see whether Capital Research and Management Company would agree, with SEC approval, to a free exchange of RMC Fund shares for those in American Group of Funds. Mr. Ratzlaff indicated that he believed that it was inappropriate to discuss the matter at that time.

Mr. Dudley had promised at the meeting of July 7th to tell the RMC representatives of the wishes of ADI Fund independent directors. Some time during the week (or perhaps weeks) following, Mr. Dudley informed Mr. Frischling that the independent directors had agreed to adjourn the meeting of shareholders from July 25, to July 31 and would meet with RMC representatives at a special meeting on July 27 at 8:30 a. m. at the offices of the attorneys for ADI Fund.

As promised, the meeting was held and Bent and Brown made a presentation of the

2. Although Bent testified that he was knowledgeable about mutual funds, he had not heard of Capital Research and Management Company before the proposal to transfer to that company the advisory and management functions of the Anchor Corporation. I accept that testimony as true—but, I must question the alleged expertise of RMC when its principals did not even know of the existence of such a substantial ($2.8 billion) and old (1931) investment advisor.

second RMC proposal. This took approximately one hour. During that meeting, it was developed that the management fee of RMC would be twenty basis points higher than that of Capital Research and Management Company and that the expense ratios of the RMC Fund were higher on a *pro forma* basis than the ADI Fund and the Cash Management Trust of America, the proposed merger parties for ADI Fund.

Later that same day, Mr. Dudley called Mr. Frischling and advised him that the RMC proposal had been rejected by the Board of Directors of ADI Fund; that the shareholder meeting would proceed on July 31; and that there would be no disclosure of the RMC proposals by the Board.

On July 31, Mr. Brown, on behalf of the plaintiff Argyle, attended the meeting of shareholders of ADI Fund. He requested "that the meeting be adjourned; " and that "the proxy material be supplemented . . . to let the shareholders know that there was another (RMC's) offer." Mr. Brown also attempted to nominate another slate of directors, however, no one present would second his nominations. All of Mr. Brown's requests were refused except that the minutes of the meeting would reflect his various motions.

Needless to say, Brown voted the shares owned by Argyle against the proposals of the Board of Directors. More importantly, however, he did this on Argyle's behalf with full knowledge of the RMC offer omitted from the proxy material. Even without the votes represented by Argyle's shares, the directors' proposals were overwhelmingly carried.

This action was initiated on August 15, 1978, and a hearing was held on August 25, 1978. The proposed merger between ADI Fund and Cash Management Trust of America was delayed until September 30, 1978, as provided by the proxy statements and agreements of both parties and without order of this Court.

At the hearing, Charles Franklin Phillips, an outside director of ADI Fund and the Chairman of the Contract Committee of the Board of that Fund, which committee constituted all of the outside directors of the ADI Fund, testified for himself and the other defendants as to the reasons why the independent directors of ADI Fund had rejected the two proposals of RMC. He also indicated that there had been three or four other such unsolicited "approaches" to the ADI Fund Contract Committee by investment advisors all of which had been rejected. Certain of Mr. Phillips' testimony will be discussed below, but at this juncture it is necessary to point out only that the proxy materials did not disclose any of these "approaches".

## IV

## THE PLAINTIFFS' THEORY OF THIS ACTION

As previously noted, RMC is an investment advisor desiring to become the investment advisor of the ADI Fund in place of the withdrawing Anchor Corporation. Argyle, on the other hand, is, as a nominee for Messrs. Bent and Brown, a shareholder in the ADI Fund.

At this juncture it must be pointed out again, that this is not a class action. It is brought solely on behalf of RMC and Argyle Arbitrage, Ltd., and for their benefit alone.[3]

The plaintiffs' first claim alleges that the proxy statement issued to the ADI Fund shareholders omitted to state material facts and was thereby violative of Sections 14(a) and 14(e) of the Securities Exchange Act 15 U.S.C. § 78n(a), (e), and Rule 14a–9 promulgated thereunder. The omissions alleged to be material were:

a) that the investment performance of CMTA was distinctly inferior to that of ADI Fund . . . ..

b) the offer of RMC . . . . to become investment advisor to the Anchor

---

**3.** This action could not even be converted into a class action since the interests of the plaintiffs are so totally divergent from, and possibly antagonistic to, those of the other shareholders of ADI Fund.

Funds and to merge ADI Fund into Reserve Fund . . . .

c) the failure and refusal by the Anchor outside directors or Contract Committee to provide RMC with a meeting to discuss and review this offer;

d) the reasons for refusal by the Anchor outside directors or Contract Committee to consider the RMC mid-May offer further;

e) the failure and refusal by the Anchor outside directors to provide RMC with sufficient, adequate and proper reasons for their refusal to consider the RMC proposal further;

f) the existence of a policy and agreement between and among the ADI Fund Directors not to give serious consideration to any offer other than the agreement proposed between ADI Fund and CRMC, regardless of the potential benefits to ADI Fund shareholders inherent in such other offers;

g) the existence of a policy, agreement and commitment between and among the ADI Fund directors not to recommend any proposal to ADI Fund shareholders other than the proposed ADI Fund/CRMC agreement, regardless of the potential benefits to ADI Fund shareholders inherent in such other proposals;

h) the identity of the then-existing directors of ADI Fund and the fact that these same individuals were directors of each of the Anchor Funds;

i) the nature and extent of the ADI Fund directors' affiliations with Anchor, including the amount of compensation and benefits received by such directors from the ADI Fund, from the Anchor Funds as a group and from Anchor-affiliated companies as a whole, both for the preceding fiscal year and for each director's entire period of service; and

j) the conflicts of interest of the ADI Fund directors in that, *inter alia:*

 a) the Anchor outside directors served at the request and sufferance of Anchor and did not exercise independent judgment with respect to the acts and transactions complained of herein; and

b) the ADI Fund directors, in collusion with Anchor, had determined to recommend CRMC as investment advisor for ADI Fund and to recommend a combination of ADI Fund and CMTA so that Anchor might gain the benefits of its proposed sale of investment advisory services for the sum of $4,000,-000, without regard to and in dereliction of said directors' duty to act in the best interests of ADI Fund shareholders.

As a second claim for relief, the plaintiffs allege that the above is also violative of 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, in that these omissions were of material facts and were made in connection with "a tender or exchange offer and in connection with the purchase and sale of securities."

The third claim for relief alleges that all of the above violated Sections 20 and 36 of the Investment Company Act, 15 U.S.C. §§ 80a-20, 35, as well as Section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6.

The fourth claim for relief alleges, without benefit of elaboration, that all of the above violated the laws of the State of Maryland as well as the common law. No exposition of the fourth claim was offered in the plethora of papers submitted on behalf of the plaintiffs in support of this motion or at the hearing.

## V

## THE DEFENSE CASE

The defendants initially claim that RMC has no standing to bring this suit. Alternatively, however, they argue that even if RMC has standing to bring the instant action neither RMC nor Argyle have made a showing of the elements necessary for a preliminary injunction to issue.

## VI

## DISCUSSION

At the hearing held herein, I permitted an objection or motion made by one defense

counsel to inure to the benefit of all defendants without the necessity of the attorney for each repeating the same motion or objection. At the end of the plaintiffs' case and again at the end of their own case, I permitted defendants' lead counsel to generalize the usual motions including motions to dismiss.

■ As to the defendants Capital Research and Management Company and Cash Management Trust of America, I assume the motion to dismiss included a motion to dismiss the entire complaint as to them. As such, it is granted. There was neither alleged nor proved any breach by either of these defendants of any federal statutory duty to the plaintiffs in this action.[4] The fourth claim for relief relying on pendant jurisdiction as to these defendants is likewise dismissed.

I now turn to the other defendants and their claim that RMC has no standing to bring the instant action. As to the alleged breaches of duty under Sections 14(a) and 14(e) of the Securities Exchange Act and Rule 14a–9 thereunder, and Sections 20 and 36 of the Investment Company Act, I conclude that RMC is not within the class of individuals from whom protection is contemplated under these sections. Simply stated, the fatal defect in RMC's status in this action is that RMC is not now nor ever was a shareholder in the ADI Fund.[5]

■ There is no question that under the proper circumstances Section 14, despite the absence of an express provision, will support a private civil suit. See, e. g., J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). As judicially construed there are two distinct situations constituting the proper circumstances under which a private action will lie, neither of

which I find applicable to the case at bar. The first group of cases, clearly inapplicable to the instant action, hold that a shareholder, as one entitled to proxy material, as well as the target corporation may maintain private actions under Section 14. See, e. g., Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969). Since RMC is neither a shareholder nor a target corporation, this will not support RMC's action.

RMC argues alternatively, however, that by virtue of its two proposals to the independent directors of the ADI Fund, RMC was in fact making tender offers to the shareholders of the ADI Fund and as an "offeror" falls within the ambit of Section 14.

While this argument has more surface appeal than the other RMC claims, once the surface is scratched it is clear that the argument is mere form without substance, and these "offers" to the directors, without more, were not in reality tender offers within the purview of the securities law.

RMC, in proposing the two plans to the ADI Fund directors, was not seeking to buy the shares of the ADI Fund shareholders, but rather was seeking to impose advisory and management fees on these shareholders by filling the advisory gap left by the withdrawing Anchor Corporation. Indeed, this was at the heart of the RMC "plans."

It cannot be argued that any formal or technical tender offer was made by RMC to the ADI Fund shareholders since no offer was ever filed with the Securities and Exchange Commission as required by the Williams Act, nor do the facts present a situation where such a filing could properly have been made.[6]

---

4. More particularly, since the gravamen of plaintiffs' complaint is the alleged material omissions from the ADI Fund proxy statements, there is no possible connection between these defendants and the alleged omissions. Certainly Capital Research and Cash Management were under no obligation or were in any way connected with the issuance of those proxy statements other than to supply full and correct information as to their own companies.

5. Plaintiffs' Supplemental Memorandum at pp. 2–3.

6. The information supplied to this Court, upon the hearing held herein, concerning the "offers" made by RMC to Anchor was woefully inadequate and clearly insufficient to constitute a valid filing as required by the Securities and Exchange Commission.

Plaintiffs rely heavily upon the holding in *Applied Digital Data Systems v. Milgo Electronic,* 425 F.Supp. 1145, 1152 (S.D.N.Y. 1977), as bestowing upon them a viable Section 14 claim despite the absence of a technical tender offer. Plaintiffs' reliance, however, is misplaced.

In *Applied Digital* the Court was faced with the novel issue of whether a plaintiff, contemplating a tender offer in the near future, may ever properly interpose a pre-tender offer suit under Section 14. In *Applied Digital* the plaintiff, the prospective offeror, had made a public announcement of its intended offer. Moreover, the terms of the offer were, even at that time, precise and well defined. Indeed, the significance given the plaintiff's public announcement of the proposed tender offer by the Court was that it established a clear and definite plan to make a tender offer. *Id.* at 1154. Under these circumstances, given the advanced stage of the offer, the Court found that the plaintiff could maintain the suit despite the absence of a technical tender offer. No such situation obtains in the case at bar. In the instant action, plaintiffs never made any public announcement of a proposed tender offer nor did they engage in any other conduct sufficient to establish a clear and definite intent to make a tender offer as contemplated in *Applied Digital.* I do not read *Applied Digital* as conferring standing upon every potential offeror regardless of the stage of development of the "proposed offer." Thus, plaintiffs can seek no refuge in the narrow doctrine of *Applied Digital* and their pre-tender offer claim must be dismissed.[7]

■ Plaintiffs also seek relief under Sections 20 and 36 of the Investment Company Act. 15 U.S.C. § 80a–20, 35. It is well settled that these sections, while giving rise to private civil actions, require that the plaintiff be a shareholder in the investment company in issue, *see, e. g., Brown v. Bullock,* 194 F.Supp. 207 (S.D.N.Y.), *aff'd,* 294 F.2d 415 (2d Cir. 1961) (Sections 20 and 36),

in order to demonstrate sufficient injury in fact. Accordingly, RMC, clearly outside the ambit of protection afforded by these sections, is without standing to seek relief thereunder. *Id.*

■ Concerning plaintiffs' claim under Section 206 of the Investment Advisers Act, 15 U.S.C. § 80b–6, I find it, too, is defective as a matter of law. The Act provides in essence for the prohibition of fraudulent transactions between an investment advisor and his "client or prospective client." It is clear that an advisor/client relationship is essential to any action brought under Section 206. *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1094–95 (S.D. N.Y.1977). *See also Person v. New York Post Corp.,* 427 F.Supp. 1297, 1303–04 (S.D. N.Y.1977). Accordingly, plaintiffs' claim is fatally defective and must be dismissed.

Turning finally to plaintiffs' claim under Section 10(b) of the Securities Exchange Act, and Rule 10b–5 promulgated thereunder, I find a similar defect compelling its dismissal.

■ It has long been recognized that, in general, before a 10(b) claim will lie, it must be demonstrated that the alleged fraud was employed "in connection with the purchase or sale" of a security. Since RMC neither purchased nor sold any securities of the defendant ADI Fund, they are clearly without standing under the general rule. *Christophides v. Porco,* 289 F.Supp. 403, 405–06 (S.D.N.Y.1968).

While not raised by the plaintiffs, there is indeed a narrow exception to this stringent "purchase/sale" requirement under 10(b). The Courts have eased this technical requisite where only injunctive relief is sought. The *bare minimum* required in these cases, however, is that the party seeking the injunctive relief at least be a shareholder of the company in issue at the time the fraud is perpetrated. *See, e. g., Mutual Shares Corp. v. Genesco, Inc.,* 384 F.2d 540 (2d Cir. 1967); *Monheit v. Carter,* 376 F.Supp. 334

---

7. In fact, RMC's sole contact with the instant suit, is that of a disappointed suitor who sought self-aggrandizement through the capture of the

fees for those advisory services previously supplied by the Anchor Corporation.

(S.D.N.Y.1974); *Christophides v. Porco,* 289 F.Supp. 403 (S.D.N.Y.1968). Accordingly, plaintiffs fail to qualify even under this narrowly drawn and carefully delineated exception and their claim must be dismissed.

Needless to say, no federal claims being available to RMC, its pendant state claims are also dismissed.

Having disposed of plaintiff RMC, I now turn to the claims of Argyle against the remaining defendants. Once again, I must reiterate that this is not a class action. Rather, Argyle is suing on its own behalf through its partners Bent and Brown. This fact becomes crucial in that at the hearing it was made clear that Bent, Brown and, consequently, Argyle, knew all of the operative facts claimed to have been omitted from the proxy material. Indeed, Argyle, at the shareholders' meeting, voted against the proposals of the Board of ADI Fund. As a result, at no point was Argyle ever taken in by any fraud, deceit or failure to disclose a material fact by defendants, nor did Argyle ever rely on any statement or omission to state a material fact by any of the defendants. It is hard to imagine how Argyle, suing in its individual capacity for equitable relief, under these facts can demonstrate the concrete injury required to maintain this suit.[8] *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In light of my holding below, however, I will assume, for purposes of this motion, that Argyle's status as a shareholder of ADI Fund at all relevant times evidences a sufficient stake in the outcome to maintain this suit.

In this Circuit, the requirements for a preliminary injunction are well settled. There is the two-pronged test set out in *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 356 F.Supp. 1066 (S.D.N.Y.), *aff'd* 476 F.2d 687 (1973) as refined in *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973):

> The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or*
>
> (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. (Emphasis in original)

Recent pronouncements by the Court of Appeals for this Circuit hold that the second-prong of the second test also requires irreparable harm. *See, e. g., Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1358 (2d Cir. 1976).

*Merits of Argyle's Case*

The claims of Argyle parallel those made by RMC. The same omissions in the proxy statement, assertedly violative of Sections 14 and 10(b) of the Securities Exchange Act, are alleged on behalf of Argyle. It is also charged that these omissions constitute violations of Sections 20 and 36 of the Investment Companies Act as well as Section 206 of the Investment Advisers Act.

It is evident that RMC's first offer or plan was dated May 18, 1978. It is also uncontested that the proxy material in issue was dated June 30, 1978. On July 7, 1978, Bent, Brown and their counsel, Carl Frischling, met with Mr. Dudley to complain of the omission of RMC's first offer. After this

---

8. It may be persuasively argued that since Argyle is suing in its individual capacity, and in one breath alleges that certain acts of fraud were perpetrated upon it by the independent ADI Fund directors through the omission of certain information in the proxy materials, while in the next breath it alleges that it had personal knowledge of the omissions before it voted at the July 31st shareholder's meeting, Argyle lacks sufficient injury to bring the instant action. Indeed, it has been held that no matter how imperative the public interest sought to be vindicated is, a plaintiff must demonstrate more than abstract concern in the suit. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In short, a plaintiff must demonstrate some concrete injury to himself. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

date, however, plaintiff RMC, through Bent and Brown, made its second offer to the independent directors through Mr. Dudley.

In light of my holding that the second proposal was separate and distinct from the first, it follows that this second proposal was intended by the plaintiffs to supersede the first. In short, I find that the first proposal was abandoned for all purposes by RMC upon making the second offer. It is obvious that upon interposing this second offer all of RMC's efforts, including the RMC presentation on July 27, 1978, were directed to selling this second, and significantly more narrow, plan to the directors.

■ The practical effect of this finding is two-fold. First, since the second offer acted to displace the first, then any omission of the earlier offer is moot and I need not determine the materiality of the omission. Second, the issue then becomes whether the directors, having previously sent the proxy material in issue, were obliged to re-solicit these proxies in order to include RMC's second offer made sometime on or after July 7, 1978, or could the directors, by exercising their independent judgment, dismiss the plan on their own as inadequate.

■ Concerning Argyle's Section 14 claims, the obvious flaw is the inability of Argyle, as an individual ADI Fund shareholder, to demonstrate that it has suffered any damage as a result of the allegedly material omissions.[9] It is true that Argyle, as the nominee of Bent and Brown and the tool of RMC, was indirectly injured since RMC failed to capture the advisory management contract in issue. This, however, is not an injury contemplated under Section 14 giving rise to remedial action. It would appear that since Argyle knew of the RMC plan and in fact voted against approval of the plan put forward by the Board of Directors of ADI Fund, it was not injured in

any way as an individual shareholder and its likelihood of success on the merits in proving a material misrepresentation is at best remote. *Cf. Gerstle v. Gamble-Skogmo, Inc.,* 298 F.Supp. 66, 103 (S.D.N.Y.1969) *modified* on other grounds 478 F.2d 1281 (2d Cir. 1973).

Turning to Argyle's claim under Section 10(b), the same result obtains. The total absence of any fraud or deceit as to this plaintiff, in a suit brought by a shareholder in his individual capacity, indeed, renders the likelihood for success on the merits a remote possibility.

Indeed, plaintiffs' claim under 10(b) and Section 14 likewise fail to raise sufficiently serious questions going to the merits as to make them fair grounds for litigation. This is true since on the papers before me, plaintiffs admit that they knew of the allegedly material omissions when they voted their shares at the July 31st meeting.

Turning to Argyle's claims of fraud and deceit under Section 20 of the Investment Company Act and Section 206 of the Investment Advisers Act, again it must be stressed that there has been absolutely no showing of reliance by Argyle as to any of the alleged material omissions. Lacking this, there is little chance of success on the merits and, therefore, no basis for the equitable relief sought. Moreover, the lack of any reliance by Argyle upon the proxy materials, removes any serious question as to the merits of the case.

I turn now to the alleged violation of Section 36 of the Investment Company Act. That section provides in pertinent part:

(b) For the purposes of this subsection, the investment adviser of a registered investment company, shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of

---

**9.** Argyle did not attempt to have the RMC proposal included in the proxy materials as it could have as a shareholder pursuant to Rule 14a–8 so that the other shareholders would be cognizant of the facts. Nor did Argyle ever go to the SEC with a complaint that there had been less than full disclosure. The plaintiff argues that this would have been unavailing

since Rule 14a–8 speaks to annual meetings and not to special meetings of shareholders such as is involved here. That is not true and I doubt that any Court or the SEC with its own arsenal of remedies would consider this interpretation of Rule 14a–8 as blocking such relief. Rule 14a–8(a)(3)(ii).

payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

15 U.S.C. § 80a–35(b).

██ In the case at bar, it is apparently alleged, however inarticulately,[10] that the directors of ADI Fund, both individually and as a Board, with the connivance of the Anchor Corporation breached their fiduciary duty to the Fund and its shareholders, including Argyle, by not giving appropriate consideration to the RMC proposals and by not disclosing these grounds to the shareholders in the proxy materials. The directors, on the other hand, argue that they were using their best business judgment in the situation presented. Argyle would have this Court rule that such a defense is unavailable. In support of this argument, Argyle points to the decision of the Second Circuit in *Lasker v. Burks, supra,* which also involved the Anchor Corporation and many of the independent directors who are defendants here. That case does *not* stand for the proposition that such a defense is unavailable, nor should it be so read.[11] In *Lasker* the issue before the Court was whether the independent directors, of a mutual fund, could terminate a *non-frivolous* shareholder's derivative action against the majority directors and advisors of the fund. Obviously, the concern of the Court in *Lasker* was not the mere exercise of the business judgment of the independent directors, but rather, under the particular circumstances presented, whether the judgment of the independent directors might be tainted and indeed, not wholly independent. The *Lasker* case, where the independent directors were called upon to determine whether to pursue litigation against their co-directors, presented the type of situation where there was a substantial likelihood that the judgment of the independent directors would be less than independent. Suffice it to say that here the outside directors were recommending to the shareholders a plan whereby the outside directors would be terminated from their positions. To suggest, as Argyle does, that this presents the same type of situation revealed in *Lasker* borders on the ridiculous. Here, there was no temptation for the independent directors to exercise anything but their truly independent judgment. Indeed, if there was any temptation present to act for their own benefit it arose from the RMC offer wherein they were promised continued appointment as independent directors.[12]

---

**10.** The Third Claim For Relief in its entirety consists of the following:

> "45. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 37, 39, 40, 42 and 43 hereof as if fully set forth herein."
>
> "46. By reason of the foregoing, defendants have violated Sections 20 and 36 of the Investment Company Act of 1940 (15 U.S.C. § 80a–20, a–35) and Section 206 of the Investment Advisors [Advisers] Act (15 U.S.C. § 80b–6)."

It is unclear, based upon the above allegations and a fair reading of Section 206, how this section is at all applicable to the case at bar. In light of my determination of the instant motion, I need not reach this question at this juncture.

**11.** Indeed, Congress, by requiring that investment companies have "unaffiliated", "outside", "independent" or "uninterested" directors, expected them to act not for themselves or the affiliated directors but rather, in the best interest of the shareholders of the mutual funds.

**12.** Argyle also argues that the directors' judgment was tainted by the directors' fees paid by ADI Fund in the past. To get persons of solid business judgment to serve in such capacities without some compensation would be impractical and is more than Congress required. Moreover, persons of such standing would not ordi-

The next question is whether the actions of the directors was reasonable in the situation. No one would suggest that every casual offer made to independent directors should be included in a proxy statement. *Elgin National Industries, Inc. v. Chemetron Corp.*, 299 F.Supp. 367 (D.Del.1969).

In the *Elgin* case, the Court ruled:

The wisdom of passing on to stockholders approaches made to management concerning exchange or merger offers lies within the *bona fide* discretion of the directors. *Id.* at 371.

The Court reached this conclusion because:

To make public every 'casual' approach looking toward the joinder of two companies would in many instances be disconcerting to stockholders, occasion innumerable inquiries concerning the terms, the extent of the discussion, possibility of consummation and the like, and, perhaps play an important part in unfortunate gyrations of the market price of the stock. *Id.* at 371.

But Argyle argues that the omission of the RMC offer was material as a matter of law and that, therefore, the business judgment test is unavailable to the defendants. In making this argument, the plaintiffs seek again to apply the rulings of *Berman v. Thomson, infra*, which as noted, is inapposite to the case at bar.

■ The test for materiality is rarely one of the law but rather is a mixed question of fact and law. What is required is that there be "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

■ Although not briefed by plaintiffs in this action, there is language in the Second Circuit's recent opinion in *Tannenbaum v. Zeller*, 552 F.2d 402, 432–34 (2d Cir. 1977), indicating that the parameters of directors' independent business judgment are severely limited. I do not read the *Tannenbaum* decision, however, as stripping the independent directors of a mutual fund of every ounce of independent business judgment, nor do I think such a result was the intent of the Court. This is certainly true to the extent that the directors need not reveal each and every plan proposed to them by a group seeking to render advisory services to a mutual fund. *See Elgin National Industries, Inc. v. Chemetron Corp., supra*, 299 F.Supp. at 371. Moreover, if there were ever a plan, so clearly capable of dismissal by the exercise of independent business judgment, this is just such a plan.[13] Looking to the proof in this case, it was clear that the RMC offer was not acceptable to the independent directors because of (i) the SEC Findings and Order against RMC and its principals (ii) the lack of conversion privilege from the money-market fund to equity or other funds (iii) the expense ratio of RMC was substantially higher than that of ADI Fund or Cash Management Trust of America (iv) the record of achievement by RMC was not outstanding; and (v) the manner and timing of the second offer was obstruent at best. If the RMC offer was included in the proxy statement, that statement would have also had to highlight the fact that any material breach of the offer of settlement in the SEC proceeding against RMC, Bent and Brown would have left the ADI Fund shareholder without any effective invest-

---

narily sell their souls for a pittance, particularly a pittance paid in the past.

**13.** The mere fact that the second offer by RMC was a formal presentation does not, in and of itself, render the omission material. A Bowery bum or a convicted con-artist could have done the same, but that would not be material. Moreover, the willingness of RMC to abandon their first offer and quickly put together an alternative plan indicates to me a fundamental lack of conviction in RMC's efforts and faith in

their own proposals. Finally, it was evident at the hearing that at the formal presentation of their second plan, Bent and Brown seemed unwilling to get down to particulars with the directors and tried to limit the presentation to abstract concepts leaving much to be worked out at a future date. This was not the type of presentation the directors had a right to expect and may account, in part, for the brevity of the presentation itself.

ment advisor. Indeed, this fact alone would permit the directors to dismiss such a plan on their own.

*Irreparable Harm*

■ Even assuming, *arguendo*, that there was a substantial likelihood that plaintiff would succeed on the merits or, alternatively, that there were serious questions as to the merits, the failure of Argyle to show the presence of irreparable harm, now required under either test for injunctive relief, *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976), is fatal to the instant motion.

In particular, plaintiff has failed under any theory of its case to demonstrate the possibility of irreparable harm should the combination of ADI Fund and Cash Management be effected as scheduled. First, it is clear that Argyle could at any time redeem its shares in the ADI Fund and within one or two days have its money which could, in turn, be reinvested in the Fund presently managed by RMC. Indeed, the only harm possible under these circumstances would be the loss, to Argyle, of a few days' interest. This minute loss, however, is a far cry from the irreparable harm necessary for a preliminary injunction in issue.[14] Furthermore, Argyle could remain as a shareholder in Cash Management and thereafter, as a shareholder, propose the combination of the former ADI Funds with RMC. These alternatives are particularly desirable in the case at bar, as opposed to granting injunctive relief, in light of Argyle's failure, as a shareholder of the ADI Fund, to take advantage of the proxy procedures available to it under Rule 14a–8. I find these failures to act by Argyle, which certainly cannot be said to have been done unwittingly, strip Argyle of any equity so that the extraordinary equitable relief sought is unavailable. Accordingly, Argyle has failed to show irreparable harm sufficient to warrant the issuance of a preliminary injunction.

Argyle fairs no better under the *Sonesta* test. Even assuming that there exist serious questions going to the merits of the case, the absence of irreparable harm is fatal to plaintiffs' request for injunctive relief. Moreover, in light of Argyle's failure to take advantage of the Rule 14a–8 procedures, the balance of hardships tips toward defendants.

Based upon the foregoing:

(1) The action is dismissed as to the defendants Capital Research and Management Company, Cash Management Trust of America;

(2) The complaint of RMC is dismissed; and

(3) The motion of Argyle Arbitrage, Ltd. for a preliminary injunction is denied.

IT IS SO ORDERED.

---

14. Argyle's reliance upon the case of *Berman v. Thomson*, 312 F.Supp. 1031 (W.D.Ill.1970), is misplaced. Argyle suggests that *Berman* stands for the proposition that any loss occasioned by a fraudulent proxy statement is within the ambit of the Federal Securities Laws. Suffice it to say, however, that *Berman* did not involve a request for injunctive relief, nor did the Court ever suggest that the mere violation of the proxy laws, absent substantial injury, constitutes irreparable harm.

Concerning Argyle's claim under Section 10(b), the same result obtains. Argyle argues that the combination of ADI Fund and Cash Management constituted a "forced sale" and Argyle has thereby suffered irreparable harm. This argument, however, loses its appeal when one realizes that Argyle, as pointed out above, could have redeemed its ADI Fund shares and reinvested its money within a relatively short time. As a result, the only harm to be realized by Argyle was at best minimal and does not constitute irreparable harm.